## E.I. DU PONT DE NEMOURS AND COMPANY, Plaintiff,

v.

## ADMIRAL INSURANCE COMPANY, et al., Defendants.

### No. 89C–AU–99.

Superior Court of Delaware, New Castle County.

Submitted: Aug. 11, 1995.
Decided: Aug. 23, 1995.

---

**48**

Charles S. Crompton, Jr. and Richard L. Horwitz of Potter, Anderson & Corroon and Richard Allen Paul and Erin Kelly of E.I. du Pont de Nemours & Company, Wilmington and Peter J. Kalis, Michael J. Lynch, Stephanie A.J. Dangel and Carolyn M. Branthoover of Kirkpatrick & Lockhart, Pittsburgh, Pennsylvania, for plaintiff E.I. du Pont de Nemours & Company.

Anthony G. Flynn of Young, Conaway, Stargatt & Taylor, Wilmington, coordinating counsel for defendants.

Donald L. Gouge, Jr. of Heiman, Aber & Goldlust, Wilmington and James E. Rocap, III, Stephen L. Braga, Scott L. Nelson and Cynthia Thomas Calvert of Miller, Cassidy, Larroca & Lewin, Washington, D.C. and Roy L. Reardon and Robert F. Cusumano of Simpson, Thacher & Bartlett, New York City, for Aetna Casualty and Surety Company on behalf of Certain Defendants.

Robert J. Katzenstein of Smith, Katzenstein & Furlow, Wilmington, for Allstate Insurance Company.

Warren B. Burt of Burt & Burt, Wilmington, for Federal Insurance Company.

Norman M. Monhait and Carmella P. Keener of Rosenthal, Monhait, Gross & Goddess, Wilmington, and Stephen A. Fennell, Steven J. Barber and Hania E. Farah of Steptoe & Johnson, Washington, D.C., for the Home Insurance Company and on behalf of Certain Defendants.

Anthony G. Flynn of Young, Conaway, Stargatt & Taylor, Wilmington, and Marjorie H. Mintzer and Ellen G. Margolis of Sheft & Sheft, New York City, for Lexington Insurance Company.

Richard K. Herrmann and Scott R. Harrison of Bayard, Handelman & Murdoch, P.A., Wilmington, for National Casualty Company.

Anthony G. Flynn of Young, Conaway, Stargatt & Taylor, Wilmington and Kimball Ann Lane and Patricia Dee Bilka of Luce, Forward, Hamilton & Scripps, New York City, for St. Paul Fire & Marine Insurance Company.

Richard K. Herrmann and Scott R. Harrison of Bayard, Handelman & Murdoch, P.A., Wilmington, for Swiss Reinsurance Company.

Judith Nichols Renzulli of Duane, Morris & Heckscher, Wilmington and Bert W. Rein, Richard L. McConnell and Lon A. Berk of Wiley, Rein & Fielding, Washington, D.C., for Travelers Indemnity Company.

**OPINION**

STEELE, Vice Chancellor.

Plaintiff E.I. du Pont de Nemours and Company ("DuPont") filed this action against Admiral Insurance Company and numerous other insurance companies seeking a declaration of the parties' rights, duties and liabilities under umbrella and excess liability insurance policies issued to DuPont by the defendants from 1967 to 1986.[1] DuPont also

1. There are policies at issue before 1967, but they are secondary to the blocks of excess insur-
 ance DuPont began to purchase in 1967.

seeks compensatory damages for defendants' alleged breach of the indemnity provisions concerning environmental claims against DuPont at a multitude of manufacturing and waste disposal sites.

The Court arranged the sites into four trial groups. *See E.I. du Pont de Nemours and Co. v. Admiral Ins. Co.*, Del.Super., C.A. No. 89C–AU–99, Steele, R.J. (Jun. 15, 1993) (Dkt. No. 910) (Order). The first trial group involves two sites, Pompton Lakes, New Jersey and Necco Park/Niagara Falls, New York (collectively, "Trial Group I Sites"). *See id.* The parties filed nineteen motions for summary judgment or partial summary judgment regarding the Trial Group I Sites, each motion asserting a different legal theory. This opinion addresses two of these motions.

DuPont seeks partial summary judgment to determine the proper interpretation of pollution exclusions found in certain policies issued between 1970 and 1985. Certain Defendants [2] seek summary judgment arguing pollution exclusions preclude coverage for DuPont's claims. This is the decision on these motions.

## I. BACKGROUND

DuPont is a Delaware corporation with its principal place of business in Wilmington, Delaware. DuPont's primary business is the manufacture of chemical and specialty products. DuPont owns and operates several plants at sites located world-wide.

The defendants are numerous national and international insurance companies which sold DuPont umbrella excess insurance policies between 1967 and 1986. DuPont purchased the insurance policies to provide coverage for DuPont plants worldwide. Each defendant has separate policies with DuPont.

Before 1967, DuPont elected to self-insure risks arising from liabilities caused by third-party personal injury or property damage. When it began to purchase excess liability insurance in 1967, DuPont continued to self-insure the primary layer in the following amounts: $2.5 million from 1967–72; $5 million in 1972–78; $10 million in 1978–80; and $50 million in 1980. The defendants' insurance policies provide coverage in excess of DuPont's self-insured retention.

I now turn to a description of the Trial Group I sites and DuPont's activities at the Trial Group I sites which contributed to the environmental contamination.

### A. Pompton Lakes Works

The first site, Pompton Lakes Works, was an explosives manufacturing facility in New Jersey. DuPont operated the facility from 1902 to 1993. DuPont disposed of waste in over 100 separate locations at the Pompton Lakes Works site, including the following principal sites of contamination:

(1) *The Shooting Pond:* An unlined pond in the northern part of the site where DuPont detonated millions of off-specification blasting caps every year from 1953 to 1988. DuPont dredged the lead-contaminated sludge on the bottom of the pond and spread it over an extensive area immediately adjacent to Acid Brook, a stream running through the property.

(2) *The Old Shooting Pond:* An unlined basin where DuPont detonated explosives, resulting in an extensive area of lead and mercury contaminated soil.

**2.** The group calling itself "Certain Defendants" includes the following defendant insurers: AIU Insurance Company, Admiral Insurance Company, Aetna Casualty & Surety Company, American Home Assurance Company, Bellefonte Insurance Company, Employer Liability Assurance Company (Commercial Union), Employers Surplus Lines Insurance Company (Commercial Union) European General Reinsurance Company of Zurich, Federal Insurance Company, Fireman's Fund Insurance Company, Gerling Konzern Allgemeine Versicherungs–Aktiengesellschaft, Globe Indemnity Company, Granite State Insurance Company, Insurance Company of the State of Pennsylvania, International Surplus Lines Company, Landmark Insurance Company, London Market Insurers, National Union Fire Insurance Company of Pittsburgh, PA, Northbrook Insurance Company (Allstate), Royal Indemnity Company, Royal Insurance Company, Swiss Reinsurance Company. Federal Insurance Company (Dkt. No. 1935), Home Insurance Company (Dkt. No. 1925), Lexington Insurance Company (Dkt. No. 1855), National Casualty Company (Dkt. No. 1921), St. Paul Fire & Marine Insurance Company (Dkt. No. 1942), and Swiss Reinsurance Company (Dkt. No. 1920) filed separate joinders to Certain Defendants' motion.

(3) *The Upper and Lower Burning Grounds:* An area where DuPont burned lead-based explosive powders and other materials contaminated with the powder on a daily basis from the 1940s to the 1980s. Lead-contaminated residues accumulated within the drainage basin of Acid Brook.

(4) *The Lead Azide Factory:* DuPont discharged wastewaters containing lead compounds into Acid Brook through settling ponds. The settling ponds were unlined from the 1930s to 1977, and concrete-lined from 1977 to 1986.

(5) *Powder Processing, Cap Production and Laboratory Facilities:* DuPont discharged washwater contaminated with lead-based powders either into Acid Brook, unlined ponds, sand pits and sumps or onto the ground in the immediate vicinity of Acid Brook at numerous facilities' locations. The discharges occurred until the early to mid–1980s.

(6) *The Mercury Fulminate Factory:* From 1912 until the end of mercury fulminate production in the 1950s, DuPont discharged mercury-contaminated wastewater into an unlined pond or pit within the floodplain of Acid Brook. DuPont also discharged fumes containing residual amounts of mercury and mercury fulminate into fume lines that ran up a hill overlooking Acid Brook.

(7) *The Sawdust Waste Pile:* DuPont dumped sawdust mixed with mercury and lead-based explosives directly onto the ground in a ravine draining to Acid Brook.

Not surprisingly, DuPont's waste disposal activities contaminated Acid Brook and the plant's soil and sediment with heavy metals, including lead and mercury. Contaminants travelled through Acid Brook and contaminated the area downstream from the plant at least between the years 1970 and 1986. DuPont has spent approximately 63.3 million dollars for extensive excavations of Acid Brook's streambed, banks and flood plain as well as the plant's soil and sediment.

Pompton Lakes Works also has extensive ground water contamination, resulting from additional DuPont waste disposal practices. For decades, DuPont placed thousands of gallons of untreated wastes, including cleaning solvents, into unlined lagoons. Two facilities, the "shell plant" (where DuPont created bronze and aluminum shells in blasting caps) and the "wire room" (where DuPont coated wire with tin in a chemical bath) primarily created the wastes. These practices ended in the early 1980s. Several other DuPont waste disposal practices contributed to the groundwater contamination, including dumping waste solvents directly on the ground or into unlined solvent "sumps", dumping laboratory liquid wastes down sink drains into pits or sumps and storing waste solvents and oils in unsealed drums which were allowed to overflow during rain.

### B. Niagara Falls Plant

The Niagara Falls Plant began chemical manufacturing activities in 1896, producing a variety of chemicals including sodium, sodium compounds, cyanide compounds, ammonia, cholorinated organic solvents (referred to as "C–1" and "C–2"), polyvinyl alcohol, and adiponitrile. DuPont purchased the plant in 1930 and continued production. DuPont's principal chemical discharges at the Niagara Plant are as follows:

(1) *Tank Washouts at the B–107 and B–84 Tank Farms:* DuPont stored C–2 solvents in on-site storage tanks. DuPont washed solvent residues, known as "tank heels", from the tanks onto the bare ground. DuPont continued the practice until the 1970s.

(2) *Solvent Burning Area:* DuPont burned waste solvents in three open pits. Defendants do not concede the solvent burning areas are sources of contamination.

(3) *Copper Sludge Disposal Pit:* DuPont disposed of drum quantities of "copper sludge" at this site.

(4) *On–Site Weathering Areas:* From the 1940s to the 1970s, DuPont placed equipment and waste materials from the sodium, sodium cyanide, metal cyanide processes as well as other cya-

nide residues on the bare ground at several locations. The "weathering process" caused barium and cyanide to leach into the ground.

(5) *Process Leaks and Spills:* DuPont released chemicals into the environment through leaks and spills in the manufacturing process, including pump seal leaks, valve failures, tank overflows, and corrosion of equipment, drains and pipes.[3]

(6) *Discharges to Gill Creek and Adjacent Areas:* Over the course of several years, DuPont routinely washed periodic leaks and spills of PCB cooling oil into a trench system leading to Gill Creek or into floor drains emptying into Gill Creek. DuPont also routinely dumped liquid wastes from a tetrachloroethane reactor to a sluice leading to the creek. DuPont asserts some of the chlorinated solvents in Gill Creek may have migrated from contaminated groundwater.

DuPont mistakenly believed that the chlorinated solvents and other substances placed on the soil would either evaporate, or that the soil would safely filter the contaminants. Instead, the substances placed on the naked land contaminated the soil, the subsurface soil, and the groundwater. DuPont's discharges contaminated the soil and groundwater at the plant with chlorinated organic solvents, cyanide, barium, heavy metals and polychlorinated biphenyls ("PCBs").

Necco Park is a 24–acre site DuPont used as a dumping ground for wastes generated by the Niagara Falls Plant from the 1930s to 1977. DuPont dumped over fifty types and approximately 93,000 tons of liquid and solid industrial wastes in pits and lagoons excavated for waste disposal. The pits were unlined; however some of the pits had earthen "dikes" extending a few feet from the ground surface. DuPont thought Necco Park would serve as a container for the wastes. Once again, DuPont erred. Nonaqueous phase liquids ("NAPLs") migrated causing damage to the groundwater and the soil.[4] Contamination began shortly after DuPont began its disposal practices.

## II. THE POLLUTION EXCLUSIONS

The majority of DuPont's umbrella and excess insurance policies issued on and after March 1, 1970 contain one of two types of pollution exclusions.[5] The first and by far the most common pollution exclusion in DuPont's insurance policies is "NMA 1685",[6] which states:

This policy shall not apply with respect to seepage, pollution or contamination to claims made against the Insured for:

(i) Personal Injury or Bodily Injury, or loss of or damage to, or loss of use of property directly or indirectly caused by seepage, pollution or contamination, provided always that This Paragraph shall not apply to

(1) liability for Personal Injury or Bodily Injury or loss of or physical damage to or destruction or tangible property, or loss of use of such property damaged or destroyed, where such seepage, pollution or

---

3. The Defendants concede, for purposes of this motion only, that the process leaks and spills caused some of the contamination at Niagara.

4. The parties dispute how the NAPLs contaminated the groundwater. DuPont argues the NAPLs formed in the subsurface after the initial discharge. Certain Defendants argue the NAPLs existed at the time of DuPont's initial release of contaminants into the environment. For reasons stated below, it is unnecessary to resolve the parties' dispute.

5. A third form of pollution exclusion called the "absolute pollution exclusion" is not at issue in this motion. This exclusion is the subject of a separate summary judgment motion.

Travelers Indemnity Company ("Travelers") filed independent opposition to DuPont's motion for partial summary judgment arguing Travelers' 1985 excess liability insurance contract contains an "absolute pollution exclusion". DuPont concedes Travelers 1985 excess policy contains both NMA 1685 and an "absolute pollution exclusion." DuPont also concedes its arguments concerning NMA 1685 and the ISO exclusion do not apply to the "absolute pollution exclusion." Therefore, Travelers' "absolute pollution exclusion" in its 1985 excess policy is not at issue in DuPont's motion.

6. The name "NMA 1685" refers to the Non–Marine Association's form number which contains this pollution exclusion.

contamination is caused by a **sudden, unintended and unexpected happening** during the period of this Insurance.

(2) The cost of removing, nullifying or cleaning-up seeping, polluting or contaminating substances unless the seepage, pollution or contamination is caused by a **sudden, unintended and unexpected happening** during the period of this Insurance.

(3) Fines, penalties, punitive or exemplary damages.

(Dangel Aff. Ex. A) (emphasis added). The second form of pollution exclusion, referred to as the "ISO Pollution Exclusion"[7] states:

This policy does not apply to personal injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste material or other irritants, contaminants or pollutants into or upon land, or the atmosphere; but **this exclusion does not** apply if such discharge, dispersal, release or escape is **sudden and accidental.**

(Dangel Aff. Ex. A) (emphasis added).[8]

## III. CONTENTIONS OF THE PARTIES

Certain Defendants contend the pollution exclusions are clear, unambiguous and preclude coverage for DuPont's claims. Certain Defendants argue the term "sudden" in the exception to the pollution exclusion has a temporal meaning synonymous with "abrupt" and DuPont's releases of contaminants were not "abrupt". Certain Defendants also argue DuPont's discharges of pollutants were not "accidental".

DuPont contends the pollution exclusions, if they apply, contain exceptions which are ambiguous. DuPont argues the term "sudden" is ambiguous, and the Court should interpret "sudden" to mean "unexpected". In support of this argument, DuPont offers dictionary definitions, treatise definitions, judicial disagreement, drafting history, and regulatory history. As an alternative, DuPont argues the Court should estop Certain Defendants from arguing "sudden" means "abrupt" based on insurance industry representations made to state insurance regulators. DuPont also argues NMA 1685's term "happening" is ambiguous and should be construed to include only discharges of contaminants known at the time the London market drafted NMA 1685 and in sufficient quantity to interfere with the use of the soil, surface water and groundwater. DuPont further contends the ISO Exclusion's "dispersal, release or escape" is ambiguous and the Court should require the "dispersal" to be a release of pollutants known to be contaminants when the ISO drafted the exclusion and the known contaminants' migration from the location where contained.

## IV. LEGAL STANDARD

A motion for summary judgment requires the Court to examine the record to determine whether any genuine issues of material fact exist. *Burkhart v. Davies*, Del.Supr., 602 A.2d 56, 59 (1991), *cert. denied*, 504 U.S. 912, 112 S.Ct. 1946, 118 L.Ed.2d 551 (1992). The Court will consider the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits when making its determination. Super.Ct.R. 56(c). After viewing the record in the light most favorable to the nonmoving party, if the Court finds no genuine issue of material fact summary judgment is appropriate. *Hammond v. Colt Indus. Operating Corp.*, Del.Super., 565 A.2d 558, 560 (1989). When faced with cross motions for summary judgment, no party's motion will be granted unless no genuine issue of material fact exists or if there is a dispute regarding the inferences which may be drawn from the facts. *Empire of Am. Relocation Servs., Inc. v. Commercial Credit Co.*, Del.Supr., 551 A.2d 433, 435 (1988).

---

7. The Insurance Services Organization ("ISO") is an association of domestic property and casualty insurers. One of the ISO's services is to develop standard policy forms for member insurers.

8. There is an issue whether policies issued by American Home Assurance Company, Lexington Insurance Company and St. Paul Fire and Marine Insurance Company for 1970–71 include pollution exclusions. A separate letter opinion will deal with this issue.

The moving party bears the burden of demonstrating no genuine issue of material fact exists. *Moore v. Sizemore*, Del.Supr., 405 A.2d 679, 680 (1979). Once this is accomplished, the burden shifts to the opponent to prove specific facts which create a genuine issue of material fact. *Id.* at 681; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). The opponent cannot create a genuine issue of material fact through bare assertions or conclusory allegations. *Martin v. Nealis Motors, Inc.*, Del. Supr., 247 A.2d 831, 833 (1968).

## V. BURDEN OF PROOF

■ The insured must prove the insurance policy's provisions provide coverage for the claimed loss. *See* 19 Ronald Anderson, *Couch on Insurance 2d* § 79:315 at 255 (M. Rhodes rev. ed. 1983); *New Castle County v. Hartford Accident & Indem. Co.*, 933 F.2d 1162, 1181 (3d Cir.1991). The burden then falls on the insurer to prove the elements of a policy exclusion. 19 *Couch on Insurance 2d, supra,* § 79:315 at 255; *New Castle County*, 933 F.2d at 1181; *Northern Ins. Co. of New York v. Aardvark Assocs., Inc.*, 942 F.2d 189, 194 (3d Cir.1991). This shifting of burdens is not contested by the parties.

■ Certain Defendants and DuPont vehemently dispute, however, whether insurers or insureds have the burden of proving an exception to an exclusion. DuPont argues the insurers have the burden of proving an exception does not apply. Certain Defendants argue the insureds have the burden of proving the exception restores coverage. As one might guess, there is a split of authority on this issue.

The minority of courts placing the burden on the insurers adhere to the traditional distinction between coverage clauses and exclusionary clauses. *New Castle County*, 933 F.2d at 1182; *United States Fidelity & Guar. Co. v. Morrison Grain Co.*, 734 F.Supp. 437, 443 (D.Kan.1990); *aff'd*, 999 F.2d 489 (10th Cir.1993). Because the policy exclusion limits coverage, the insurers have the burden of proving the exclusion applies. Accordingly, the insurers also have the burden of proving the exclusion's exception does not apply.

The majority of courts have held the policyholder has the burden of proving an exception to an exclusion. *Aeroquip Corp. v. Aetna Casualty & Sur. Co., Inc.*, 26 F.3d 893, 894–95 (9th Cir.1994); *see also North American Philips Corp. v. Aetna Casualty & Sur. Co.*, Del.Super., C.A. No. 88C–JA–155, Bifferato, R.J., 1995 WL 628442 (Mar. 10, 1995) Mem.Op. at *4 (applying New York law); *Monsanto Co. v. Aetna Casualty & Sur. Co.*, Del.Super., C.A. No. 88C–JA–118, Ridgely, P.J., 1993 WL 563253 (Dec. 9, 1993), *aff'd*, Del.Supr., No. 39, 1994, Hartnett, J., 1994 WL 632468 (Nov. 7, 1994) (Order) (applying Missouri law); *Aardvark*, 942 F.2d at 195; *A. Johnson & Co., Inc. v. Aetna Casualty & Sur. Co.*, 933 F.2d 66, 75–76 n. 14 (1st Cir. 1991); *Hudson Ins. Co. v. Double D Management Co.*, 768 F.Supp. 1542, 1545 (M.D.Fla.1991); *Fireman's Fund Ins. Cos. v. Ex–Cell–O Corp.*, 702 F.Supp. 1317, 1328–29 (E.D.Mich.1988). The traditional rationale for placing the burden on the insureds is the exception to the exclusion creates coverage where it would not otherwise exist. Because the burden is on the insureds to prove the claim falls within the scope of coverage, the insureds must prove coverage is revived through applying the exclusion's exception. *Monsanto, supra*, at 12; *Aeroquip*, 26 F.3d at 895.

In my view, insureds should have the burden of proving an exception to the exclusion applies. Several sound reasons compel this conclusion. First, placing the burden on the insureds is fair. *Monsanto, supra*, at 13. The insureds have access to the facts that will demonstrate whether the discharge of pollutants is "sudden, unintended and unexpected" or "sudden and accidental". *Aeroquip*, 26 F.3d at 895. The insurance carriers would have an undue burden collecting evidence to negate the exclusions' exceptions for the insureds' activities over decades. *Ex–Cell–O*, 702 F.Supp. at 1328.

The reality of this case illustrates the point. The damage in this case spanned as many as five decades. DuPont policy, since at least 1978, is to destroy documents relating to underlying environmental problems

and DuPont's remediation efforts once they "become valueless for business purposes". DuPont had access to the documents; the insurers did not. Several witnesses have also died since the late 1970s. The insurers never had access to their knowledge. Placing the burden on the insurers creates a gross injustice relative to their ability to gain access to pertinent information.

Second, an estimation of the probabilities supports placing the burden on the insured. *Monsanto, supra,* at 13; *Ex–Cell–O,* 702 F.Supp. at 1328. To prove the exceptions revive coverage, policyholders must assert the more unusual event, a "sudden, unintended or unexpected" event or "sudden and accidental" event, occurred. *Monsanto, supra,* at 13.

Third, in the pollution context, adopting a rule that places the burden on an insured would provide incentive for the insured to discover and prevent gradual discharges of pollution. By comparison, to place the burden on the insurer would provide an incentive to the insured to avoid discovering gradual pollution because "preservation of ignorance would increase the likelihood of insurance coverage." *Aeroquip,* 26 F.3d at 895.

For these reasons, I find Delaware law places the burden of proving an exception to an exclusion on the insured. DuPont has the burden of proving the discharges of pollutants were "sudden and accidental" or a "sudden, unintended and unexpected happening" caused the "seepage, pollution and contamination".

## VI. RULES OF CONTRACT CONSTRUCTION APPLYING TO THE POLLUTION EXCLUSION

### A. Law of The Case

■ DuPont argues the law of the case binds the Court to admit extrinsic evidence to interpret the contract provisions, even if the contractual language is unambiguous. This Court has addressed the use of extrinsic evidence to interpret contracts under Delaware law four times in this case. The first decision, on September 19, 1990 denied ten defendants' summary judgment motion based

on "absolute" pollution exclusion clauses. *E.I. du Pont de Nemours & Co. v. Admiral Ins. Co.,* Del.Super., C.A. No. 89C–AU–99, Poppiti, J., 1990 WL 140100 (Sep. 19, 1990) (Order) at 16. DuPont argued the Court could not entertain summary judgment unless the court considered extrinsic evidence concerning the drafters intent. *Id.* at 11. Relying on *Klair v. Reese,* Del.Supr., 531 A.2d 219 (1987), and *Empire of Am. Relocation Servs., Inc. v. Commercial Credit Co.,* Del.Supr., 551 A.2d 433 (1988), the Court found Delaware had adopted the "modern view" of contract interpretation allowing the court to consider extrinsic evidence to show the context and circumstances surrounding the meaning of clear and unambiguous contractual language. *E.I. du Pont, supra,* at 11–15; *see also* 3 Arthur L. Corbin, *Corbin on Contracts* § 542 (1960); Restatement (Second) of Contracts § 212(1) (1981).

Several defendants moved for reargument and/or clarification of Judge Poppiti's September 19, 1990 order based on *Pellaton v. Bank of New York,* Del.Supr., 592 A.2d 473 (1991), a case decided after the Court's September 19, 1990 opinion. On January 13, 1992, the Court denied defendants' motions for reargument, harmonizing *Klair* and *Pellaton.* The Court decided *Pellaton* merely excluded parol evidence "to vary or contradict" unambiguous contractual provisions. *E.I. du Pont, supra,* at 3. The Court held *Pellaton* did not overrule the *Klair* proposition that extrinsic evidence is admissible for the purpose of interpreting the meaning of an unambiguous provision. *Id.*

In 1993, DuPont made a motion to compel certain defendants to produce documents comprising the contractual language's drafting history as well as other interpretive material. The SDM granted DuPont's motion to compel. *See E.I. du Pont, supra,* Rubenstein, SDM (Aug. 20, 1992) (Order). Defendant Wausau, joined by several other defendants, filed an exception to the SDM's order. In denying Wausau's exception, the Court reaffirmed the Court's earlier rulings, stating:

> Drafting history will provide information which explains the circumstances in the industry surrounding the use of the term

[pollutant]. From this, the Court will be able to determine the intent behind the parties' agreement and ultimately decide whether the absolute pollution exclusions preclude the coverage duPont seeks. . . . I find no contradiction between Judge Poppiti's decision to allow discovery of extrinsic evidence in this circumstance and Delaware law on contract interpretation.

*E.I. Du Pont, supra,* Steele, R.J. (Feb. 17, 1993) (Order) at 5–6, 1993 WL 54498.

DuPont also filed exceptions to the SDM's August 20, 1992 ruling. In response, defendants argued the Court should depart from the law of the case and prohibit production of extrinsic evidence because Judge Poppiti's decision is contrary to Delaware law. *E.I. Du Pont, supra,* Steele, R.J. (Mar. 5, 1993) Mem. Op. at 4–5, 1993 WL 80633. Noting the Court had already considered and rejected defendants' argument, the Court refused to depart from Judge Poppiti's earlier decisions. *Id.* at 5.

■■■ The law of the case doctrine is designed to prevent relitigation of prior determinations and inconsistent judgments. *See Moses v. State Farm Fire & Casualty Ins. Co.,* Del.Super., C.A. No. 90C–10–20, Herlihy, J., 1992 WL 179488 (Jun. 25, 1992) Letter Op. at 3. The law of the case is established when the Court applies a legal principal to an issue based on facts remaining constant over the course of litigation. *Kenton v. Kenton,* Del.Supr., 571 A.2d 778, 784 (1990). A party seeking to have the Court reconsider the earlier ruling must demonstrate newly discovered evidence, a change of law, or manifest injustice. *Frank G.W. v. Carol M.W.,* Del.Supr., 457 A.2d 715, 719 (1983); *Monsanto v. Aetna Casualty & Sur. Co.,* Del.Super., C.A. 88C–JA–118, Ridgely, P.J., 1993 WL 563253 (Dec. 9, 1993) at 9, *aff'd,* Del.Supr., No. 39, 1994, Hartnett, J., 1994 WL 632468 (Nov. 7, 1994) (Order).

■■■ From 1991 to the present, many cases have questioned, limited, and clarified *Klair,* including *Pellaton; Citadel Holding Corp. v. Roven,* Del.Supr., 603 A.2d 818 (1992); *Sonitrol Holding Co. v. Marceau Investissements,* Del.Supr., 607 A.2d 1177 (1992); *City Investing Co. Liquidating Trust v. Continen-*

*tal Casualty Co.,* Del.Supr., 624 A.2d 1191 (1993); *AOC Limited Partnership v. Horsham Corp.,* Del.Ch., C.A. No. 12480, Chandler, V.C., 1992 WL 136474 (Jun. 17, 1992) Mem.Op.; *Sequa Corp. v. Aetna Casualty & Sur. Co.,* Del.Super., C.A. No. 89C–AP–1, Herlihy, J., 1992 WL 207251 (Aug. 7, 1992) Mem.Op.; *ISTI Delaware, Inc. v. Townsend,* Del.Super., C.A. No. 91C–08–017, Graves, J., 1993 WL 189467 (Mar. 31, 1993) Mem.Op., *appeal dismissed,* Del.Supr., 628 A.2d 83 (1993); and *James River–Pennington Inc. v. CRSS Capital, Inc.,* Del.Ch., C.A. No. 13870, Steele, V.C., 1995 WL 106554 (Mar. 6, 1995) Mem.Op. These cases, some decided during and some after the *E.I. du Pont* decisions, now provide a clear picture of Delaware law differing from Judge Poppiti's view that Delaware adopted the "modern theory" of contracts. At a minimum, these cases justify a reconsideration of the earlier *E.I. du Pont* decisions.

The beginning point in the analysis, of course, is the *Klair* decision. The Delaware Supreme Court in *Klair* stated, during a discussion of clear and unambiguous contractual language:

[T]he court is not free to exclude or disregard extrinsic evidence; for the meaning of words used in an agreement can only be known through an appreciation of the context and circumstances in which they were used. For this reason, the *Restatement (Second) of Contracts* (see § 212, especially comment b), the Uniform Commercial Code (6 *Del.C.* § 2–202) as well as Williston (4 *W. Jaeger, Williston on Contracts* § 629 (3rd ed. 1961)) and Corbin (3 *A. Corbin, Corbin on Contracts* § 542 (1960)) all reject the proposition that extrinsic evidence can be excluded in determining the meaning of an agreement.

*Klair,* 531 A.2d at 223. The literal text of *Klair* stands for the proposition, or "modern view", that the court may consider extrinsic evidence even when the contract is clear and unambiguous.

The next Delaware Supreme Court case, *Pellaton,* states clearly:

[I]f the instrument is clear and unambiguous on its face, neither [the Delaware Supreme Court] nor the trial court may con-

sider parol evidence "to interpret it or search for the parties' intent[ions]...." *Hibbert v. Hollywood Park, Inc.*, Del. Supr., 457 A.2d 339, 343 (1983). *Pellaton*, 592 A.2d at 478. The Supreme Court also demonstrated how the Court would limit the legal standard enunciated in *Klair*:

> When there is uncertainty in the meaning and application of the terms of the contract, this Court, and the trial court, will consider testimony pertaining to antecedent agreements, communications and other factors which bear on the proper interpretation of the contract. *Klair v. Reese*, 531 A.2d at 223.

*Id.* It is understandable, with the imprecise nature of the term "uncertainty," that the breadth of *Klair* was still unclear after *Pellaton.*

The Delaware Supreme Court's next contractual interpretation case, *Citadel Holding*, precisely stated the Delaware rules of contract construction:

> It is an elementary canon of contract construction that the intent of the parties must be ascertained from the language of the contract. *Myers v. Myers*, Del.Supr., 408 A.2d 279 (1979); *DuPont v. Wilmington Trust Co.*, Del.Ch., 45 A.2d 510 (1946). **Only when there are ambiguities may a court look to collateral circumstances.** *Klair v. Reese*, Del.Supr., 531 A.2d 219 (1987).

*Citadel Holding*, 603 A.2d at 822 (emphasis added). The Supreme Court once again limited *Klair*'s application of extrinsic evidence to ambiguous contractual language.

In *Sonitrol*, the Delaware Supreme Court refused to consider any extrinsic evidence when interpreting clear and unambiguous contractual language. *Sonitrol*, 607 A.2d at 1182 (citing *Pellaton*, 592 A.2d at 478). Trial courts began to recognize that the Delaware Supreme Court, in the later cases, had reevaluated *Klair* and returned to the traditional rule of contract interpretation. *AOC*, *supra*, at 15 ("Although [*Klair*] may appear to be authority for the argument that a decisionmaker always must consider parol evidence ... subsequent caselaw has demonstrated that *Klair* is not so broad....");

*Sequa Corp., supra*, at 7. Delaware courts could no longer consider extrinsic evidence when interpreting a clear and unambiguous contractual provision. *AOC*, *supra*, at 15; *Sequa Corp., supra*, at 7.

If there were any doubt about the current state of Delaware law regarding contractual interpretation, the Delaware Supreme Court's recent decision in *City Investing* puts that doubt to rest:

> If a writing is plain and clear on its face, *i.e.*, its language conveys an unmistakable meaning, the writing itself is the **sole source** for gaining an understanding of intent. *Citadel Holding Corp. v. Roven*, Del.Supr., 603 A.2d 818, 822 (1992).

*City Investing*, 624 A.2d at 1198 (emphasis added); *see also James–River, supra*, at 11–12; *ISTI, supra*, at 6.

Therefore, I find current Delaware law precludes the use of extrinsic evidence to interpret clear and unambiguous language. Of course, if the contractual provision is ambiguous, I may use extrinsic evidence to discern the parties' intent. I cannot blindly adhere to prior rulings that are inconsistent with current Delaware law. In short, I must conform the law of this case to the most recent pronouncements of the Delaware Supreme Court concerning contractual interpretation.

## B. Delaware Rules of Contract Interpretation

Interpreting the language of a contractual provision is a question of law. *Pellaton v. Bank of New York*, Del.Supr., 592 A.2d 473, 478 (1991). The Court's analysis must focus on determining the intent of the parties. *See E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, Del.Supr., 498 A.2d 1108, 1113 (1985). The Court must first attempt to ascertain the parties' intent from the language of the contract. *Citadel Holding Corp. v. Roven*, Del.Supr., 603 A.2d 818, 822 (1992). The principal question is whether or not the contractual language is ambiguous. An ambiguity exists when the contractual provisions are "reasonably or fairly susceptible" of different interpretations or two different meanings. *Rhone–Poulenc Basic*

*Chems. Co. v. American Motorists Ins. Co.,* Del.Supr., 616 A.2d 1192, 1196 (1992). Both interpretations must be reasonable readings of the provision's text. *Aetna Casualty and Sur. Co. v. Kenner,* Del.Supr., 570 A.2d 1172, 1174 (1990). As the Delaware Supreme Court stated:

> Ambiguity does not exist where the court can determine the meaning of a contract "without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends."

*Rhone–Poulenc,* 616 A.2d at 1196 (citation omitted). Contractual language is not ambiguous merely because parties in litigation disagree concerning the provision's proper construction. *City Investing Co. Liquidating Trust v. Continental Casualty Co.,* Del. Supr., 624 A.2d 1191, 1198 (1993); *Rhone–Poulenc,* 616 A.2d at 1196; *Kenner,* 570 A.2d at 1176. Where the language is clear and unambiguous no court may use "ambiguity" as an excuse to create a more perfect contract never agreed to by the parties. *Hallowell v. State Farm Mut. Auto. Ins. Co.,* Del.Supr., 443 A.2d 925, 926 (1982). The Court will not twist, distort or torture contractual terms to create an ambiguity when the language is clear and unambiguous. *Rhone–Poulenc,* 616 A.2d at 1196; *Kenner,* 570 A.2d at 1174. The Court may not consider extrinsic evidence in an effort to construe an unambiguous contract. *City Investing,* 624 A.2d at 1198; *Citadel Holding,* 603 A.2d at 822; *Pellaton,* 592 A.2d at 478. When the contractual provision is clear and unambiguous, the court will give the provision's terms their plain meaning. *See Hallowell,* 443 A.2d at 926. In this case, contractual interpretation focuses on the language of the pollution exclusion clauses.

## VII. DUPONT'S CLAIMS FALL WITHIN THE POLLUTION EXCLUSIONS

The Court must first determine whether DuPont's claims for coverage fall within the pollution exclusions. NMA 1685 precludes coverage for personal injury or property damage caused by "seepage, pollution or contamination". The ISO exclusion precludes coverage for personal injury or property damage arising out of a "discharge, dispersal, release or escape" of several named pollutants, including fumes, acids, toxic chemicals, liquids, gases, waste materials, and the catch-all of "other irritants, contaminants or pollutants", into the air, land and water.

DuPont's pleadings, statements and affidavits establish DuPont's claims arise from releases of chemical substances and wastes causing environmental contamination of soil, groundwater and surface water. DuPont's waste disposal practices over 91 years contaminated the Pompton Lakes site with lead and mercury. DuPont's chemical discharges and waste disposal practices over decades contaminated the Niagara Plant site with a number of contaminants including cyanide, organic solvents, barium, heavy metals and PCB's. For over 40 years, DuPont's dumping of 93,000 tons and 50 different types of industrial waste contaminated the Necco Park site. For decades, DuPont's standard operating and waste disposal procedures caused the contamination which gives rise to the present action. DuPont does not, and cannot, dispute its claims fall within the pollution exclusions. Therefore, I find the pollution exclusions preclude coverage for DuPont's claims unless DuPont can establish the exceptions to the exclusions apply.

## VIII. THE EXCEPTIONS TO THE POLLUTION EXCLUSIONS

The NMA 1685 pollution exclusion contains an exception "where such seepage, pollution or contamination is caused by a **sudden, unintended and unexpected happening.**" The ISO exclusion contains an exception when the "discharge, dispersal, release or escape is **sudden and accidental.**" Both exclusions contain the coordinating conjunction "and". Clearly, this means in order for the exclusion to apply, a party must prove each of the exclusion's elements—the pollution's cause must be "sudden, unintended *and* unexpected" or the pollutant's discharge must be "sudden *and* accidental." *See Monsanto Co. v. Aetna Casualty & Sur. Co.,* Del.Super., C.A. No. 88C–JA–118, Ridgely, P.J., 1993 WL 563253 (Dec. 9, 1993) at 9–10,

*aff'd,* Del.Supr., No. 39, 1994, Hartnett, J., 1994 WL 632468 (Nov. 7, 1994) (Order).

## IX. THE MEANING OF SUDDEN

The parties dispute the meaning of the term "sudden" as it appears in the exceptions to the pollution exclusions. Certain Defendants argue "sudden" unambiguously requires a temporal definition synonymous with "abrupt". DuPont argues "sudden" means "unforeseen" or "unexpected". "Sudden" is not specifically defined in the policy.

■ Many courts have wrestled with this exact issue. Understandably, there is a split of opinion with some courts deciding "sudden" means "abrupt" [9] and other courts deciding "sudden" means "unexpected." [10] Until now, no Delaware state court has decided if "sudden" is "ambiguous" in the pollution exclusion context under Delaware law.

### A. "Sudden" Is Clear and Unambiguous

DuPont first points to the various definitions of "sudden" in dictionaries to argue the word "sudden" is ambiguous. For example, *Webster's Third New International Dictionary* (1986) defines sudden as:

1a: happening without notice or with very brief notice: coming or occurring unexpectedly: not foreseen or prepared for

b: changing ... character all at once: ... abrupt.

One definition incorporates a temporal element while the other definition does not. Although dictionaries are helpful finding the ordinary meaning of a term, they are "imperfect yardsticks of ambiguity." *New Castle County v. Hartford Accident and Indem. Co.,* 933 F.2d 1162, 1193–94 (3d Cir.1991). Dictionaries define almost all words in several ways, and different dictionaries may often have different definitions. Some dictionary

---

**9.** *See, e.g., Monsanto, supra,* at 19–28 (applying Missouri law); *Anaconda Minerals Co. v. Stoller Chem. Co.,* 990 F.2d 1175, 1178–79 (10th Cir. 1993); *Aetna Casualty & Sur. Co. v. General Dynamics Corp.,* 968 F.2d 707, 710 (8th Cir. 1992) (applying Missouri law); *Aeroquip Corp. v. Aetna Casualty & Sur. Co.,* C.D.Cal., CV 90–4260 RG(Gx), Gadbois, D.J., (Oct. 16, 1991) at 7–9 (applying California law), *aff'd,* 26 F.3d 893 (9th Cir.1994); *Freedom Gravel Prods., Inc. v. Michigan Mut. Ins. Co.,* 819 F.Supp. 275, 280–81 (W.D.N.Y.1993) (applying New York law); *Bureau of Engraving v. Federal Ins. Co.,* 793 F.Supp. 209, 212–13 (D.Minn.1992) (applying Minnesota law), *aff'd,* 5 F.3d 1175 (8th Cir.1993); *Gould, Inc. v. CNA,* 809 F.Supp. 328, 336–37 (M.D.Pa. 1992) (applying Pennsylvania law), *aff'd,* 5 F.3d 1489 (3d Cir.1993); *Smith v. Hughes Aircraft Co.,* 783 F.Supp. 1222, 1230–33 (D.Ariz.1991) (applying Arizona and California law), *aff'd in relevant part,* 10 F.3d 1448 (9th Cir.1993), *as amended,* 22 F.3d 1432 (9th Cir.1993); *Terminix Int'l Co. v. Maryland Casualty Co.,* D.Tenn., No. 88–2186–4B, McRae, S.J. (March 7, 1991) (Order) at 5–6 (applying Tennessee law), *aff'd,* 956 F.2d 270 (6th Cir.1992); *United States Fidelity & Guar. Co. v. Morrison Grain Co.,* 734 F.Supp. 437, 446 (D.Kan.1990) (applying Kansas law), *aff'd,* 999 F.2d 489 (10th Cir.1993); *Dimmitt Chevrolet, Inc. v. Southeastern Fidelity Ins. Corp.,* Fla.Supr., 636 So.2d 700, 704 (1994); *Lumbermens Mut. Casualty Co. v. Belleville Indus., Inc.,* 407 Mass. 675, 555 N.E.2d 568, 571–73 (1990); *Upjohn Co. v. New Hampshire Ins. Co.,* 438 Mich. 197, 476 N.W.2d 392, 397 (1991); *Waste Management of Carolinas, Inc. v. Peerless Ins. Co.,* 315 N.C. 688, 340 S.E.2d 374, 382 (1986); *Hybud Equip. Corp.*

*v. Sphere Drake Ins. Co.,* 64 Ohio St.3d 657, 597 N.E.2d 1096, 1102 (1992), *cert. denied,* 507 U.S. 987, 113 S.Ct. 1585, 123 L.Ed.2d 152 (1993). This list is merely a small sampling of the cases which have found "sudden" to mean "abrupt". For further cases, *see New Castle County v. Hartford Accident and Indem. Co.,* 933 F.2d 1162, 1195 n. 60 (3d Cir.1991) and *Monsanto, supra,* at 19 n. 11.

**10.** *See, e.g., New Castle County v. Hartford Accident & Indem. Co.,* 933 F.2d 1162, 1198 (3d Cir.1991) (purportedly applying Delaware law); *Patz v. St. Paul Fire & Marine Ins. Co.,* 15 F.3d 699, 703, (7th Cir.1994) (applying Wisconsin law); *South Carolina Ins. Co. v. Coody,* 813 F.Supp. 1570, 1579 (M.D.Ga.1993) (applying Georgia law); *Hecla Mining Co. v. New Hampshire Ins. Co.,* Colo.Supr., 811 P.2d 1083, 1092 (1991); *Claussen v. Aetna Casualty & Sur. Co.,* 259 Ga. 333, 380 S.E.2d 686, 688 (1989); *Morton Int'l, Inc. v. General Accident Ins. Co. of Am.,* 134 N.J. 1, 629 A.2d 831, 875 (1993), *cert. denied,* 512 U.S. 1245, 114 S.Ct. 2764, 129 L.Ed.2d 878 (1994); *Greenville County v. Insurance Reserve Fund,* 313 S.C. 546, 443 S.E.2d 552, 553 (1994); *Queen City Farms, Inc. v. Central Nat'l Ins. Co. of Omaha,* 126 Wash.2d 50, 882 P.2d 703, 726 (1994); *Joy Technologies, Inc. v. Liberty Mut. Ins. Co.,* 187 W.Va. 742, 421 S.E.2d 493, 500 (1992); *Just v. Land Reclamation, Ltd.,* 155 Wis.2d 737, 456 N.W.2d 570, 573 (1990). Once again, this list is only a representative sample of the case law. For more citations, *see Monsanto, supra,* at 20 n. 12 and *New Castle County,* 933 at 1195 n. 61.

editors use different definitions merely to avoid plagiarism. *Upjohn Co. v. New Hampshire Ins. Co.*, 438 Mich. 197, 476 N.W.2d 392, 398 (1991). If the mere existence of different dictionary definitions constitutes an ambiguity, drafting unambiguous contractual language would be impossible without defining almost every word. *Bureau of Engraving v. Federal Ins. Co.*, 793 F.Supp. 209, 212 (D.Minn.1992). Standing alone, multiple dictionary definitions do not prove all differing definitions are reasonable. *Monsanto, supra*, at 23. Therefore, I find the mere existence of dueling dictionary definitions of "sudden" does not render "sudden" ambiguous.

DuPont also relies on a treatise explanation of the word "sudden" to prove ambiguity. In *Couch on Insurance 2d*, Couch explains:

> When coverage is limited to a sudden 'breaking' of machinery the word 'sudden' should be given its primary meaning as a happening without previous notice or as something coming or occurring unexpectedly, as unforeseen or unprepared for. That is, 'sudden' is not to be construed as synonymous with instantaneous.

10A Ronald Anderson, *Couch on Insurance 2d* § 42:396, at 505 (M. Rhodes rev. 2d ed. 1982). This treatise explanation is in the context of "breaking" or "breakdown" in property insurance. Within the context of property insurance policies, this explanation may be reasonable. The treatise does not, however, analyze "sudden" in the context of the pollution exclusions as I must do. I find the treatise explanation concerning the meaning of "sudden" not relevant to the definition of "sudden" in the context of the exception to the pollution exclusion clause in CGL policies.

DuPont argues Delaware courts have recognized the ambiguity of the word "sudden" for many years, citing *Cannon v. Delaware Electric Power Co.*, Del.Super., 24 A.2d 325, 326 (1942). In *Cannon*, the plaintiff's declaration's second count stated " 'while the plaintiff was in the aisle of the bus walking to a seat', the defendant negligently 'started the said bus too suddenly before the said plaintiff had reached a place of safety in said bus'."

*Cannon*, 24 A.2d at 325. The defendant demurred on two grounds, alleging the phrase "too suddenly" to be ambiguous. *Id.* The Court reasoned:

> The word "sudden" is a word of somewhat varied meaning. It may have the significance of "quick", "rapid", "unexpected", "without previous notice", or "with very brief notice"; or its use may be fairly suggestive of abrupt, precipitate, rash, or even violent action.

*Id.* at 326. Based on this reasoning, the Court affirmed the demurrer because the count contained more than one theory of negligence. *Id.* The Court, however, did not ascertain the meaning of "sudden" as intended in contractual language or, obviously, in the specific context of the pollution exclusion. Without the surrounding policy provisions and clause's language, *Cannon* does not help determine whether "sudden" is ambiguous in the pollution exclusion clause.

DuPont asserts the conflicting judicial interpretations of the term "sudden" establishes "sudden" is ambiguous. Several courts have decided sudden means unexpected based on extrinsic evidence, the doctrine of reasonable expectations, the doctrine of *contra proferentum* and regulatory estoppel among other theories. My task is to look solely at the language of the contractual provision and determine whether "sudden" is capable of two reasonable interpretations. *Rhone–Poulenc*, 616 A.2d at 1196. Unless the language itself has two reasonable meanings, I cannot find ambiguity. *See Hallowell*, 443 A.2d at 926. The fact other courts have determined "sudden" is ambiguous based on extracontractual doctrines or extrinsic evidence is not relevant to my analysis of the pollution exclusion. Therefore, a split in case law does not render "sudden" ambiguous. *Accord Monsanto, supra*, at 22–23.

DuPont argues this Court should follow the Third Circuit's decision in *New Castle County v. Hartford Accident and Indemnity Co.*, 933 F.2d 1162 (3d Cir.1991); *see also Harleysville Mutual Ins. Co., Inc. v. Sussex County*, 831 F.Supp. 1111, 1120–21 (D.Del. 1993) (adopting *New Castle County's* construction of "sudden and accidental"). The *New Castle County* decision, which purport-

edly applied Delaware law, considered the conflicting dictionary definitions of "sudden", the existence of judicial disagreement over whether "sudden" is unambiguous or ambiguous, and the drafting and marketing history of the pollution exclusion clause. *New Castle County,* 933 F.2d at 1193–98. After examining these factors, the Court found the term "sudden" to be ambiguous. *Id.* at 1198. On the weight of this perceived ambiguity, the Court construed the ambiguity against the insurer and adopted the "unexpected" definition. *Id.* at 1198–99.

In *New Castle County* the Federal Court attempted to predict how the Delaware Supreme Court would decide this issue without any guidance from Delaware state courts. No Delaware decisions on this issue existed. *Northern Ins. Co. of New York v. Aardvark Associates, Inc.,* 942 F.2d 189, 193 (3d Cir. 1991). *New Castle County* considered extrinsic evidence regarding the context and circumstances surrounding the pollution exclusion *before* finding the exclusion to be ambiguous. In support of this principle of law, *New Castle County* relied on *E.I. du Pont de Nemours & Co. v. Admiral Insurance Co.,* Del.Super., C.A. No. 89C–AU–99, Poppiti, J., 1990 WL 140100 (Sep. 19, 1990) (Order). As I have discussed in detail above, *E.I. du Pont* is not the current Delaware law for interpreting contracts. Instead, the Delaware Supreme Court now requires the trial court to examine policy language without considering extrinsic evidence to determine ambiguity. *See, e.g., City Investing,* 624 A.2d at 1198; *Citadel Holding,* 603 A.2d at 822. When confronted with the pollution exclusion clause under Pennsylvania law, which is similar to current Delaware law, the Federal Court felt constrained to follow Pennsylvania state court precedent finding the term "sudden" contained a temporal meaning. *Northern Ins.,* 942 F.2d at 193. I decline to follow blindly *New Castle County's* reasoning or holding.

My obligation is to determine whether the term "sudden" is ambiguous in the context of the specific pollution exclusions at issue *without relying on extrinsic evidence.* Accordingly, I will consider the language of the exclusion within the context of the entire policy without resorting to conflicting dictionary definitions, inapposite treatise definitions, judicial disagreement or drafting history.

The language of NMA 1685 ("sudden, unintended and unexpected") and the language of the ISO exclusion ("sudden and accidental") are very similar. Other courts have recognized no meaningful difference between the two exclusions. *Monsanto, supra,* at 25; *Olin Corp. v. Insurance Co. of North America,* 762 F.Supp. 548 (S.D.N.Y.1991), *aff'd,* 966 F.2d 718 (2d Cir.1992). Therefore, I will analyze the term "sudden" as it applies to both pollution exclusions simultaneously.

First, the word "sudden", as it is commonly used, means happening abruptly without prior notice. *Dimmitt Chevrolet, Inc. v. Southeastern Fidelity Ins. Corp.,* Fla. Supr., 636 So.2d 700, 704 (1993); *Upjohn Co. v. New Hampshire Ins. Co.,* 438 Mich. 197, 476 N.W.2d 392, 397 (1991); *Hybud Equip. Corp. v. Sphere Drake Ins. Co., Ltd.,* 64 Ohio St.3d 657, 597 N.E.2d 1096, 1102 (1992). This is the plain meaning of the word, and I must accord contractual terms their plain and ordinary meaning. *See Hallowell,* 443 A.2d at 926. Courts have recently described insureds' attempts to render the pollution exclusions ambiguous as "something only a lawyer's ingenuity could achieve", *American Motorists Insurance Co. v. General Host Corp.,* 667 F.Supp. 1423, 1429 (D.Kan.1987), *aff'd,* 946 F.2d 1482 (10th Cir.), *vacated in part on rehearing,* 946 F.2d 1489 (10th Cir. 1991), and as "a strange logic", *Waste Management of Carolinas, Inc. v. Peerless Insurance Co.,* 315 N.C. 688, 340 S.E.2d 374, 379 (1986). I agree.

Second, "sudden" does not stand alone in the exception to the exclusion, but is a critical requirement in the conjunctive phrase "sudden and accidental". Courts generally agree the term "accidental" means unexpected or unintended. *Monsanto, supra,* at 21; *see, e.g., Hartford Accident & Indem. Co. v. United States Fidelity & Guar. Co.,* 962 F.2d 1484 (10th Cir.), *cert. denied,* 506 U.S. 955, 113 S.Ct. 411, 121 L.Ed.2d 335 (1992); *Dimmitt,* 636 So.2d at 704 (1993). To give "sudden" the meaning of "unexpected" would make "sudden *and* accidental" redundant. A

court must construe a contract as a whole to avoid a construction that renders a provision meaningless. *Seabreak Homeowners Ass'n, Inc. v. Gresser,* Del.Ch., 517 A.2d 263, 269 (1986), *aff'd,* Del.Supr., 538 A.2d 1113 (1988). A court must give effect to all contractual provisions. *E.I. du Pont de Nemours & Co. v. Shell Oil Co.,* Del.Supr., 498 A.2d 1108, 1114 (1985). This analysis is thoroughly explained in *Northern Insurance Co. of New York v. Aardvark Associates, Inc.:*

> To read "sudden and accidental" to mean only unexpected and unintended is to rewrite the policy by excluding one important pollution coverage requirement—abruptness of the pollution discharge. The very use of the words "sudden *and* accidental" (emphasis added) reveal [sic] a clear intent to define the words differently, stating two separate requirements. Reading "sudden" in its context, i.e. joined by the word "and" to the word "accident", the inescapable conclusion is that "sudden", even if including the concept of unexpectedness, also adds an additional element because "unexpectedness" is already expressed by "accident" This additional element is the temporal meaning of sudden, i.e. abruptness or brevity. To define sudden as meaning only unexpected or unintended, and therefore as a mere restatement of accidental, would render the suddenness requirement mere surplusage.

942 F.2d 189, 192 (3d Cir.1991) (quoting *Lower Paxton Township v. United States Fidelity & Guar. Co.,* 383 Pa.Super. 558, 557 A.2d 393, 402, *appeal denied,* 523 Pa. 649, 567 A.2d 653 (1989)). In the context of the entire exclusion, "sudden" only has meaning when read to contain a temporal element.

This interpretation becomes even clearer when addressing the language of NMA 1685. By according "sudden" a meaning of "unexpected", the exception to the exclusion would mean "unexpected, unintended and unexpected". This contortion of the common meaning of the term "sudden" creates a clear redundancy. *Monsanto, supra,* at 25. Reading all contractual terms as having meaning, *E.I. du Pont, supra,* 498 A.2d at 1114, the only reasonable meaning of the term "sudden" in the context of the NMA Exclusion contains a temporal element synonymous with "abrupt."

Third, giving "sudden" its clear and appropriate temporal meaning resolves any question of ambiguity concerning the structure of policy coverage. Typically, CGL policies provide broad coverage for "occurrences" including continuous or repeated exposure to a condition. Whether the event happens abruptly or gradually is irrelevant with respect to the definition of occurrence. This broad coverage is limited by the pollution exclusion, which excludes coverage for damages caused by the discharge, release or escape of pollutants. As with the broad coverage provided by "occurrence", whether the act is abrupt or gradual is irrelevant for determining whether the exclusion applies. The exclusion, of course, contains an exception. If the term "sudden" in the exception is given a temporal definition, the policy covers abrupt discharges; the policy does not cover gradual discharges. However, if the term "sudden" is given the meaning "unexpected", the exception to the exclusion reinstates coverage for the same events as the definition of "occurrence", i.e. gradual and abrupt exposures, rendering the pollution exclusion meaningless. *Hybud Equip.,* 597 N.E.2d at 1102–03. Having to give effect to the pollution exclusion leads to one inevitable conclusion—"sudden" has a temporal definition.

Finally, public policy supports a temporal definition for the term "sudden". According "sudden" the same meaning as "unexpected" would exclude coverage only for intentional polluters. This interpretation of "sudden" does not provide incentive for companies to take steps to discover and prevent gradual pollution. *Waste Mgt.,* 340 S.E.2d at 381. Giving "sudden" a temporal meaning, in contrast, provides strong incentive for companies to detect diligently and prevent gradual pollution because the policies would only cover "sudden" negligent discharges. *Hybud Equip.,* 597 N.E.2d at 1103. The polluting companies, which are in the best position to detect and stop gradual pollution, would take steps to prevent gradual pollution from occurring. *Id.* Companies will be forced to give more careful consideration to the conse-

quences to the environment of their business decisions.

Turning specifically to NMA 1685, DuPont argues reading "sudden" as "abrupt" conflicts with the term "seepage". Assuming DuPont is correct in its assumption "seepage" implies a gradual process, "seepage" does not conflict with the term "sudden". DuPont's argument attempts to create an inconsistency by isolating specific terms without looking at the terms within the structure and context of the pollution exclusion. In order to fall within the exception, a "sudden, unintended and unexpected happening" must cause the "seepage, pollution or contamination." By interpreting "sudden" as "abrupt" NMA 1685 clearly and unambiguously states the cause of the seepage must be abrupt, not the seepage itself. *Monsanto, supra*, at 25. Therefore, I find no inconsistency results if "sudden" is accorded its plain meaning of "abrupt" in the NMA Exclusion.

■ In sum, I find the term "sudden" has only one reasonable meaning in the policy context here. That meaning must contain a temporal element synonymous with "abrupt". Therefore, the exceptions to the pollution exclusions are clear and unambiguous. Because the policy language is unambiguous, I may not consider arguments pertaining to the drafting or regulatory history of the pollution exclusion in the context of the meaning of "sudden". DuPont's initial discharges must have occurred abruptly in order to qualify for the exception to the pollution exclusion.

## B. Regulatory Estoppel

■ DuPont argues the insurers should be estopped from asserting the exceptions to the pollution exclusions are limited to "abrupt" events. To bolster its claim, DuPont now relies upon insurance industry representations made to insurance regulators.[11] A few courts interpret the exception to the pollution exclusion in a manner consistent with their interpretations of the insurance

industry's statements to insurance regulatory authorities in seeking approval of the language. *See Morton Int'l, Inc. v. General Accident Ins. Co. of Am.*, N.J.Supr., 134 N.J. 1, 629 A.2d 831 (1993), *cert. denied*, 512 U.S. 1245, 114 S.Ct. 2764, 129 L.Ed.2d 878 (1994); *Joy Technologies, Inc. v. Liberty Mut. Ins. Co.*, 187 W.Va. 742, 421 S.E.2d 493 (1992). These authorities are unpersuasive for two reasons.

First, *Morton, Joy* and cases using similar reasoning rely heavily on their interpretations of the insurance industry's representations to administrative bodies and entirely disregard the contractual language. *See Morton*, 629 A.2d at 872 (recognizing the plain meaning of "sudden" includes a temporal requirement). In reality, these courts do not "estop" insurance companies from denying coverage for gradual pollution, but reform the contract to read out the pollution exclusion based on subjectively assumed public policy grounds. Using selective portions of the regulatory submissions, the courts make broad assumptions of fact and draw conclusions unsupported by the record. *See, e.g., Morton*, 629 A.2d at 872 ("The material and substantial reduction in coverage proposed by the pollution-exclusion clause, if disclosed to regulators in New Jersey and elsewhere, undoubtedly would have affected adversely the industry's rates for CGL coverage."). At best, the insurance industry's representations are unclear. However, even if the portions cited by the *Morton* court are considered misrepresentations, the regulators had the clear and unambiguous language of the ISO pollution exclusion before them.[12] As one court stated:

To start, *Morton* seems grossly insulting to the members of all the regulatory agencies for it implies that all of them accepted the statements made to them by 'the industry' changing the meaning of an unambiguous clause. That suggests, at the kindest, naivety and passivity.

---

11. No evidence of reliance by DuPont on these representations and their alleged deceptiveness at the time the parties struck their contractual bargain appears in the record.

12. London defendants only had to seek approval of NMA 1685 in two states, Illinois and Kentucky. The "regulatory representation" consists of one letter which is as unclear as the ISO exclusion's regulatory representations.

*Carrier Corp. v. Home Ins. Co.*, Conn.Super., No. CV–88–352393–8, O'Neill, J. (Oct. 31, 1994) Mem. of Decision at 4. It appears, in light of forty-five affidavits filed by insurance regulators from more than thirty-five states, the unclear "explanation" of the ISO pollution exclusion did not "mislead" the regulators.[13]

One glance at the record demonstrates DuPont cannot be relegated to *Morton*'s assumed class of beneficiaries of regulatory ineptness. The 1970–71 policies, the first policies to contain pollution exclusions, contained the ISO "sudden and accidental" exclusion. Dissatisfied with Aetna's attitude and its inability to manipulate Aetna, DuPont switched brokers to Marsh and McLennan in late 1970, developed its own manuscript policy and had Marsh and McLennan place the 1970–71 insurance coverage with various insurers. DuPont chose to include the NMA 1685 pollution exclusion, and not the ISO pollution exclusion, in the majority of the policies for the next fifteen years. The minority of the policies between 1971 and 1986 containing ISO pollution exclusions actually contain *both* the NMA 1685 and ISO pollution exclusions. Therefore, the record reflects DuPont, a sophisticated insured, prepared the manuscript insurance policy and insisted on including specific standardized wording in the contract.

Second, it is a well-settled rule that when the clear and unambiguous terms of an insurance policy preclude coverage, a policyholder cannot create coverage by asserting estoppel. *Independent Petrochemical Corp. v. Aetna Casualty & Sur. Co.*, 842 F.Supp. 575, 582 (D.D.C.1994); *K.J. Quinn & Co. v. Continental Casualty*, 806 F.Supp. 1037, 1044 (D.N.H.

1992); *see Matia v. Carpet Transp., Inc.*, 888 F.2d 118, 121 (11th Cir.1989). This Court has stated the rule as follows:

> As a general rule estoppel cannot be invoked to create an insurance contract where none exists and cannot operate to bring within a policy's coverage property, risks, or losses which by the terms of the policy are expressly excepted or otherwise excluded. 16A Appleman Insurance Law and Practice, § 9090 (1968); 18 Couch on Insurance 2d, § 71:35 (1968); 45 C.J.S. Insurance § 674 (1946).

*Container Corp. of America v. Bituminous Casualty Corp.*, Del.Super., 252 A.2d 117, 121 (1969); *National Fire Ins. Co. of Hartford v. Eastern Shore Laboratories, Inc.*, Del.Super., 301 A.2d 526, 530 (1973); *see Mutual Benefit Life Ins. Co. of Newark, N.J. v. Bailey*, Del.Supr., 190 A.2d 757, 761 (1963).[14] The pollution exclusions clearly and unambiguously exclude coverage for damage caused by pollution. The pollution exclusions' exceptions clearly and unambiguously restore coverage for the abrupt and unexpected advent of pollution causing bodily injury or property damage. Despite the invitation to do so, I cannot revisit the original bargain and rewrite the contract to include gradual damage in the pollution exclusions' exceptions or limit the exclusion to the intentional discharge of "known" pollutants. Therefore, I find DuPont's regulatory estoppel argument fails as a matter of law.

## X. THE MEANING OF "HAPPENING"

■ "Happening", as it appears in NMA 1685 is a broad, flexible term. DuPont argues the term is so broad it is ambiguous.

---

**13.** In my opinion, courts using *Morton*'s rationale are attempting to reform the contractual language to find coverage for the insured in order to ensure the pollution is remediated, believing insurance premium payors or the stockholders of the insurance company can more broadly diffuse and thereby best absorb the loss. Presumably, DuPont made a conscious business decision to dispose of the waste as cheaply as possible. It would be unconscionable judicial risk shifting to remove the burden of remediating the pollution from DuPont's shareholders, who benefited from DuPont's waste disposal decisions for fifty years.

**14.** This is not a factual situation similar to *Employers' Liability Assurance Corp. v. Madric*, Del.Super., 174 A.2d 809 (1961), where an insurance agent represented to an "untutored and unsophisticated" insured the policy covered the insured's son despite the fact the contractual terms only providing coverage for the insured and his spouse. *Madric*, 174 A.2d at 810. In that case, the insured justifiably relied on the agent's representation. *Cf. Bailey*, 190 A.2d at 761. This situation is dissimilar in two respects. First, DuPont is a sophisticated insured with its own brokers and legal department. Second, DuPont cannot demonstrate it relied on the insurance industry's representations to its detriment.

DuPont asserts one reasonable interpretation of "happening" contains two requirements: (1) the migration of known contaminants (known at the time the London market drafted NMA 1685); (2) sufficient quantities of contaminants to cause "pollution" or "contamination" as those terms were understood at the time the London insurance market drafted NMA 1685. This argument relies on historical evidence that most industries and municipalities discharged contaminants into the environment on a regular basis in the early 1970s. "Happening", like the definition of occurrence, is a very broad and flexible term, encompassing a number of different events. *See Monsanto, supra*, at 24. That it may encompass a spectrum of events of notable breadth does not make it less understandable or clear. Nothing in the language of NMA 1685 requires a "known pollutant" or a "sufficient quantity of contaminants to interfere with the use of the ground or water." If the parties had possessed the vision DuPont suggests they would have modified the language accordingly. I cannot rewrite the parties' contract to create obligations never agreed to by the parties.

## XI. THE POLLUTION EXCLUSIONS FOCUS ON THE INITIAL DISCHARGE

### A. "Happening" Applies To The Causative Act

DuPont argues the term "happening" in the exception to the NMA 1685 pollution exclusion is not limited to the initial discharge of pollutants into the environment. DuPont asserts "happening" is a broad, flexible term which could reasonably be interpreted to apply to the migration of contaminants. The essence of DuPont's argument is the migration of contaminants, and not DuPont's routine discharges into the environment, caused the contamination at the Trial Group I sites. DuPont claims this alternative meaning, at a minimum, creates an ambiguity which the Court should construe against the insurers.

Once again, I am asked to isolate one word without looking at an entire clause and thereby create uncertainty. The exception to the exclusion applies if the "seepage, pollution or

contamination is caused by a sudden, unintended and unexpected happening." This phrase is clear and unambiguous—a sudden, unintended and unexpected happening must cause the seepage, pollution or contamination for the exception to the exclusion to apply. The term "happening" is necessarily broad, taking into account a wide range of events. The plain meaning of "happening" is not confined to contaminants known at the time the London market drafted NMA 1685. However, the phrase's adjectives "sudden, unexpected and unintended" and the phrase's verbal clause "is **caused** by" limits the term "happening" to the originating causative act of the pollution. In essence, the term "happening" is the cause and the "seepage, pollution or contamination" is the effect. The term "happening" does not refer to the damage, or effect, occurring after the causative act. Therefore, when reading the clause in its entirety, the only reasonable interpretation of the term "happening" is to focus on the initial discharge into the environment. *Accord Monsanto, supra*, at 25–26; *IMC-ERA Group Inc. v. American Home Assurance Co.*, Cal.Super., No. BC 011005, Fleming, J. (Sep. 8, 1993) at 14; *Olin Corp. v. Insurance Co. of N. Am.*, 762 F.Supp. 548, 563 (S.D.N.Y.1991), *aff'd*, 966 F.2d 718 (2d Cir.1992); *Independent Petrochemical Corp. v. Aetna Casualty & Sur. Co.*, C.A. No. 83–3347, Flannery J., 1988 WL 242659 (D.D.C. Sep. 7, 1988) at 182–83, *rev'd on other grounds*, 944 F.2d 940 (D.C.Cir.1991), *cert. denied*, 503 U.S. 1011, 112 S.Ct. 1777, 118 L.Ed.2d 435 (1992); *see also In re Texas Eastern Transmission Corp. PCB Contamination Ins. Coverage Litig.*, 870 F.Supp. 1293, 1347 (E.D.Pa.1992), *aff'd*, 995 F.2d 219 (3d Cir.1993), *aff'd on reh'g*, 15 F.3d 1249 (3d Cir.), *cert. denied*, 513 U.S. 915, 115 S.Ct. 291, 130 L.Ed.2d 206 (1994) ("It is the insured's initial discharge, however, not the resulting damage or pollution, that is the focus of the inquiry under the pollution exclusion clauses.").

The act causing the contamination is DuPont's initial discharge of toxic chemicals and elements into the environment. This is most clearly illustrated by DuPont's discharge of chemicals directly onto the ground.

DuPont's own expert in hydrology indicates large areas of soil were contaminated immediately after coming into contact with these chemicals. DuPont's waste disposal practice constituted the causative act. DuPont's argument attempts to shift the Court's focus to other events DuPont claims "caused" the pollution, including the migration of the chemicals "causing" the groundwater contamination. DuPont's waste discharges into the streams running through DuPont's property demonstrates the weakness of DuPont's argument. The running streams' currents carried the chemicals away from the point of the initial discharge to contaminate other property; however, it is not reasonable to focus on the stream's current as the cause of the pollution in order to interpret the exception to the pollution exclusion. The contamination would not have occurred "but for" DuPont's initial discharge of pollutants. DuPont's initial discharge into the stream caused the contamination. Similarly, the migration of chemicals to the groundwater did not "cause" the contamination. The discharge of contaminants into the environment "caused" the contamination. The later migration of the chemicals and contamination of the land is the "effect" of the discharge.

In sum, I find the language of the pollution exclusion and the context of contamination can lead to only one reasonable meaning of the term "happening" in the context of NMA 1685. The term "happening" is clear and unambiguous. The term "happening" in the exception to NMA 1685 refers to the causative act of the initial discharge of contaminants into the environment.

## B. ISO Exclusion

 The language of the ISO pollution exclusion focuses on the "discharge, dispersal, release or escape" of contaminants into the environment, and the exception applies if "such discharge, dispersal, release or escape is sudden and accidental." The parties do not dispute the language of the ISO pollution exclusion focuses on the discharge of chemicals into the environment, and not the resulting damage. *See New Castle County v.*

*Hartford Accident and Indem. Co.*, 933 F.2d 1162, 1199–1202 (3d Cir.1991) (adopting the damage/discharge distinction applying Delaware law). At issue is the meaning of "discharge". DuPont argues the relevant "discharge, dispersal, release or escape" to be the contaminants leaving their intended container or location and moving to another location. Certain Defendants argue the ISO exclusion applies to the insurer's initial release of contaminants into the environment.

The only Delaware case applying Delaware law to this issue is *National Union Fire Ins. Co. v. Rhone–Poulenc Inc.*, Del.Super., C.A. No. 87C–SE–11, Chandler, V.C. (Sep. 7, 1993) Mem.Op. In *Rhone–Poulenc,* the Court interpreted a pollution exclusion clause which stated the policy did not apply "to bodily injury or property damage arising out of any emission, discharge, seepage, release or escape" of any pollutant if the "emission, discharge, seepage, release or escape is either expected or intended". *Id.* at 2.[15] Focusing on the language "arising out of", the Court decided the language could only be reasonably read to include the original act of the insured. *Id.* at 7–8. I agree.

The language of the ISO pollution exclusion states coverage is excluded for "personal injury or property damage *arising out of* the discharge, dispersal, release or escape" of various pollutants. The word "discharge" cannot be analyzed in a vacuum without considering the provision's entire language. First, the phrase "arising out of" has only one reasonable meaning in the context of the pollution exclusion—originating from, growing out of or flowing from. *Accord Hartford Accident & Indem. Corp. v. United States Fidelity and Guar. Co.*, 962 F.2d 1484, 1491 (10th Cir.), *cert. denied,* 506 U.S. 955, 113 S.Ct. 411, 121 L.Ed.2d 335 (1992); *see Rhone–Poulenc, supra,* at 8. This definition does not limit the relevant discharge to the *most proximate* cause of the contamination. *See Rhone–Poulenc, supra* at 8. "Arising out of" includes any discharge from which the contamination flowed. *Id.* at 8. In order

---

15. Although this language differs from the ISO pollution exclusion, the analysis is still relevant because the opinion focuses on identifying the

pertinent discharge in the pollution exclusion context.

to qualify as a "discharge" under the pollution exclusion, there must only be some causal relationship between the discharge and the damage. *Hartford,* 962 F.2d at 1491.

Second, the term "discharge" is also tied to the exclusion's language "into and upon land". Giving "discharge" its plain and ordinary definition it becomes obvious DuPont's sluicing wastes directly into a creek; emptying reactor pots and storage tanks directly onto the bare soil; piling wastes on the ground and exposing them to weather; detonating explosives in unlined impoundments; spreading dredged materials directly onto bare ground; spilling and leaking chemicals onto the bare ground; burning explosives on the bare ground; discharging waste water and solvents directly onto the ground; discharging waste water containing lead directly into a stream; discharging untreated wastes into unlined lagoons; and pouring tons of wastes over decades into unlined pits constitute the relevant "discharges into and upon land" for the purpose of the pollution exclusion. *See Broderick Inv. Co. v. Hartford Accident & Indem. Co.,* 954 F.2d 601, 607 (10th Cir.), *vacated in non-relevant part on reh'g,* 954 F.2d 601, 608 (10th Cir.), *cert. denied,* 506 U.S. 865, 113 S.Ct. 189, 121 L.Ed.2d 133 (1992). Any other interpretation defies the plain meaning and ordinary usage of the word "discharge".

Third, DuPont's assertion confuses the notion of a "discharge" with the resulting damages. *St. Paul Fire and Marine Ins. Co. v. Warwick Dyeing Corp.,* 26 F.3d 1195, 1204 (1st Cir.1994). The contract is clear that the relevant discharge, and not the resulting damages, must be "sudden and accidental". *Id.; see New Castle County,* 933 F.2d at 1202. The resulting property damage is the environmental contamination. The cause of the contamination is DuPont's placing various elements and contaminants into the environment. The contamination is coterminous with the "release" or "escape" of the pollutants. *Warwick,* 26 F.3d at 1204. Reading the clause to include the "second-

ary discharge" dangerously blurs the distinction between "intentional discharge" and "intentional damage", by grafting an intent requirement relating to damage in the unambiguous language of the ISO pollution exclusion. *Id.; Broderick,* 954 F.2d at 607. I cannot engage in a result-oriented analysis to eviscerate the exclusion by manipulating the clear and unambiguous language of the ISO exclusion to find an uncertainty where none exists.

Therefore, I find the language of the ISO exclusion is clear and unambiguous—the relevant "discharges" are DuPont's initial discharges of contaminants into the environment. *Accord North American Philips Corp. v. Aetna Casualty & Sur. Co.,* Del.Super., C.A. No. 88C–JA–155, Bifferato, J., 1995 WL 628442 (Mar. 10, 1995) Mem.Op. at 15; *Monsanto, supra,* at 29; *G. Heileman Brewing Co. v. Royal Group., Inc.,* 779 F.Supp. 736, 740 (1991), *aff'd,* 969 F.2d 1042 (2d Cir.1992); *Oklahoma Publishing Co. v. Kansas City Fire & Marine Ins. Co.,* 805 F.Supp. 905, 910 (W.D.Okla.1992); *Remington Arms Co. v. Liberty Mut. Ins. Co.,* 810 F.Supp. 1406, 1418 (D.Del.1992); *In re Acushnet River & New Bedford Harbor: Proceedings Re Alleged PCB Pollution,* 725 F.Supp., 1264, 1268 n. 8 (D.Mass.1989), *modified,* 938 F.2d 1423 (1st Cir.1991), *cert. denied,* 502 U.S. 1073, 112 S.Ct. 969, 117 L.Ed.2d 134 (1992); *Texas Eastern, supra,* 870 F.Supp. at 1326, 1346, 1349–50.[16] Consequently, DuPont's assertion it did not expect or intend the resulting environmental contamination is irrelevant. For the purposes of the "sudden and accidental" exception, only the initial release is relevant.

Despite the plain and unambiguous language of the ISO pollution exclusion, DuPont argues the polluting event must be a discharge of a *known* pollutant. Once again, I turn to the language of the ISO exclusion, which precludes coverage for "bodily injury or property damage arising out of the discharge ... of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gas-

16. Commercial Union Insurance Company and the Employers' Liability Assurance Corporation (collectively, "Commercial Union") moved to strike "ISO Hypotheticals" offered by DuPont to reflect the parties' intent. Because the language of the exclusions is unambiguous, I decline to consider extrinsic evidence. Therefore, I need not resolve Commercial Union's motion to strike.

es, waste materials or other irritants, contaminants or pollutants." The prepositional phrase beginning with the word "of" lists a series of possible pollutants including the catch-all "other irritants, contaminants or pollutants." The ISO exclusion's list of pollutants is clear and unambiguous—the list does not contain a scienter element. *New Castle County v. Hartford Accident and Indem. Co.*, 970 F.2d 1267, 1271 (3d Cir.1992), *cert. denied*, 507 U.S. 1030, 113 S.Ct. 1846, 123 L.Ed.2d 470 (1993). The exclusion contains no requirement that the insured "know" the material discharged to be a pollutant. I cannot contort the pollution exclusion clause to readjust the parties' bargain. Therefore, I find the ISO pollution exclusion does not contain a requirement that DuPont "know" the substances discharged were pollutants at the time it made the decision to release them into the environment.

Completely disregarding the language of the ISO exclusion, DuPont, despite no evidence of relying upon them at the time the contractual bargain was struck, argues the regulatory representations made by the insurance industry should estop the insurers from asserting "sudden and accidental" refers to the initial discharge. As stated above, the ISO exclusion clearly and unambiguously refers to the initial discharge of contaminants. The ISO pollution exclusion precludes coverage for accidental pollution damage caused by intentional acts. DuPont cannot use estoppel to provide coverage for risks or losses expressly excluded by the policies' terms. *See Container Corp.*, 252 A.2d at 121.

## XII. APPLYING THE EXCEPTIONS TO THE POLLUTION EXCLUSIONS

 How do the pollution exclusions apply in this case? The undisputed facts demonstrate DuPont deliberately, intentionally and routinely disposed of industrial waste at the three Trial Group I sites over a period of decades. At Pompton Lakes Works, DuPont intentionally disposed of wastes by detonating blasting caps; detonating explosives; spreading lead-contaminated sludge over the ground; burning lead based explosive powder; releasing lead-contaminated wastewaters into Acid Brook; discharging lead-based explosive powders' washwater into Acid Brook unlined ponds, sand pits, sumps or onto the ground; releasing mercury-contaminated wastewater into an unlined pond or a pit within Acid Brook's floodplain; releasing mercury and mercury fulminate contaminated fumes into the fume lines; dumping mercury and lead contaminated sawdust directly onto the ground; pouring untreated wastes into unlined lagoons; and dumping waste solvents directly onto the ground. These routine discharges, taking place over many decades, cannot be considered "sudden". *See Hybud*, 597 N.E.2d at 1097 (long-term pattern of polluting discharges); *Smith v. Hughes Aircraft Co.*, 22 F.3d 1432, 1438 (9th Cir.1993) (discharges into unlined ponds); *Fischer & Porter Co. v. Liberty Mut. Ins. Co.*, 656 F.Supp. 132 (E.D.Pa.1986) (pouring contaminants into floor drains); *Olin Corp.*, 762 F.Supp. at 560–61 (discharging DDT wastewater and chemical byproducts over 16 year period). These deliberate, intentional and ongoing releases of waste materials also cannot be considered "accidental" or "unintended and unexpected". *Broderick*, 954 F.2d at 607–08 (discharging wastes into a pond); *Remington Arms*, 810 F.Supp. at 1418 (burning/detonation of wastes); *K.J. Quinn & Co. v. Continental Casualty*, 806 F.Supp. 1037, 1044 (D.N.H.1992) (disposing of waste into landfill); *Anaconda Minerals Co. v. Stoller Chem. Co.*, 773 F.Supp. 1498 (D.Utah 1991), *aff'd*, 990 F.2d 1175 (10th Cir.1993) (piling wastes directly onto ground); *Olin Corp.*, 762 F.Supp. at 561 (discharging DDT wastewater into trench system leading to creek), *aff'd*, 966 F.2d 718 (2d Cir.1992); *see also Great Lakes Container Corp. v. National Union Fire Ins. Co. of Pittsburgh, PA.*, 727 F.2d 30, 33 (1st Cir. 1984) (dumping barrel residue directly onto ground).

DuPont asserts some contamination at the Pompton Lakes Works site occurred through leaks and spills based on Edward S. Seger's affidavit, which states "By 1966, lead, mercury and copper had been deposited at the PLW site through various waste handling and disposal practices and through leaks and spills of materials in connection with manu-

facturing activities." (Seger Aff. at ¶ 11). Seger is a DuPont employee who worked with DuPont Environmental Remediation Services ("DERS") from 1990. Seger did not work at Pompton Lakes Works and did not recite any knowledge of the sources of contamination at the site in his deposition. (Seger Dep. at 30–32, 44–49, 212–213, 274). This type of conclusory allegation is not sufficient to create a genuine issue of material fact. *See Martin,* 247 A.2d at 833.

The undisputed facts demonstrate DuPont intentionally engaged in a routine course of conduct discharging pollutants into the environment at the Pompton Lakes Works site. These discharges were not "sudden", "accidental" or "unintended and unexpected". The exceptions to the pollution exclusions do not apply. Therefore, coverage for DuPont's claims concerning the Pompton Lakes Works site are precluded by both NMA 1685 and the ISO exclusion.

Over forty years, DuPont routinely dumped tons of wastes at Necco Park into unlined pits and lagoons. DuPont's regular disposal practice over forty years cannot be considered "sudden". *Accord Monsanto, supra,* at 29 (dumping over forty years not sudden); *Aardvark,* 942 F.2d at 190, 195 (dumping of two years not sudden); *see also Hybud,* 597 N.E.2d at 1097. DuPont's intentional dumping of its wastes also cannot be considered "accidental" or "unintended and unexpected". *See K.J. Quinn,* 806 F.Supp. at 1044 (disposal of wastes in landfill produced in normal course of business not "accidental"); *Oklahoma Publishing,* 805 F.Supp. at 910 (W.D.Okla.1992) (sending solvent wastes to a landfill was not "accidental"); *Liberty Mut. Ins. Co. v. Triangle Indus., Inc.,* 765 F.Supp. 881, 885–86 (N.D.W.Va. 1991), *aff'd,* 957 F.2d 1153 (4th Cir.), *cert. denied,* 506 U.S. 824, 113 S.Ct. 78, 121 L.Ed.2d 42 (1992) (dumping sludge into landfill was not "accidental"). The exceptions to the pollution exclusions do not apply. Consequently, coverage for DuPont's Necco Park claims are precluded by the pollution exclusions.

At the Niagara Falls Plant, DuPont disposed of wastes by washing C–2 solvent residues onto the bare ground; burning waste solvents in open pits; depositing drum quantities of "copper sludge"; placing equipment and waste materials from the manufacturing processes on the bare ground to be "weathered"; and discharging waste water filled with PCB's directly into Gill Creek or into floor drains which emptied into Gill Creek. Similar to the Pompton Lakes works cites, these intentional routine discharges over several decades cannot be considered "sudden", "accidental" or "unintended and unexpected". *See* Pompton Lakes Works analysis, *supra.* The pollution exclusions apply to DuPont's claims relating to these discharges, and the exceptions to the pollution exclusions cannot restore coverage.

█ Spills or leaks also contributed to the contamination at the Niagara Falls Plant. There is no evidence what portion of the contamination the spills or leaks "caused", if any. DuPont was not specifically aware these leaks and spills would occur. However, as one DuPont witness described:

> Generally, where you have a chemical plant, you have drippings and leaks from time to time. It's the nature of the chemical business.

(Amery Dep. at 38.) This is evidence the spills and leaks were part of the normal business activities at the Niagara Falls plant. DuPont has not put forward any evidence to create a genuine issue of material fact regarding whether the leaks and spills were a routine part of DuPont's business. While these discharges may be considered "sudden", as a routine part of DuPont's normal business operations the leaks and spills certainly could not be considered "unexpected" or "accidental". *See Lumbermens Mut. Casualty Co. v. Belleville Indus. Inc.,* 938 F.2d 1423, 1428–29 (1st Cir.1991), *cert. denied,* 502 U.S. 1073, 112 S.Ct. 969, 117 L.Ed.2d 134 (1992); *Industrial Indem. Ins. Co. v. Crown Auto Dealerships, Inc.,* 731 F.Supp. 1517, 1521 (1990); *Weber v. IMT Ins. Co.,* Iowa Supr., 462 N.W.2d 283, 287 (1990). DuPont has not argued to the contrary, except for the conclusory characterization of the spills and leaks as "accidental". Therefore, summary judgment is appropriate for all of DuPont's claims regarding the Niagara Falls plant site.

## XIII. CONCLUSION

I find the NMA 1685 and ISO pollution exclusions preclude coverage for DuPont's claims for the Trial Group I sites. DuPont cannot restore coverage using the exceptions to the pollution exclusions. The Plaintiff's Motion for Partial Summary Judgment Regarding the Proper Interpretation of Certain Pollution Exclusions Found in 1970–1985 Insurance Policies is *denied.* Certain Defendants' Joint Motion For Partial Summary Judgment on Pollution Exclusion Defenses is *granted.*

In accordance with my letter to counsel of this same date, an Order prepared by Defendants' coordinating counsel, approved as to form by all moving parties will be signed upon presentation.