NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

───────────────────────

VIAD CORP, *Plaintiff/Appellee/Cross-Appellant*,

*v.*

MONEYGRAM INTERNATIONAL, INC.; and MONEYGRAM
PAYMENT SYSTEMS, INC., *Defendants/Appellants/Cross-Appellees*.

Nos. 1 CA-CV 15-0053
1 CA-CV 15-0341
(Consolidated)
FILED 11-1-2016

───────────────────────

Appeal from the Superior Court in Maricopa County
No. CV2010-029939
The Honorable Patricia A. Starr, Judge

**AFFIRMED IN PART; REVERSED IN PART**

───────────────────────

COUNSEL

Squire Patton Boggs (US) LLP, Phoenix
By Brian A. Cabianca, Donald A. Wall and Kerryn L. Holman
*Counsel for Plaintiff/Appellee/Cross-Appellant*

Coppersmith Brockelman PLC, Phoenix
By L. Keith Beauchamp and Roopali H. Desai
*Co-Counsel for Defendants/Appellants/Cross-Appellees*

and

Baker & Hostetler LLP, Cleveland, OH
By Martin T. Wymer and Michael D. Meuti
*Co-Counsel for Defendants/Appellants/Cross-Appellees*

---

**MEMORANDUM DECISION**

Presiding Judge Andrew W. Gould delivered the decision of the Court, in which Judge Peter B. Swann and Judge Patricia A. Orozco joined.

---

**G O U L D**, Judge:

**¶1**        MoneyGram International Inc., appeals from the superior court's entry of summary judgment in favor of Viad Corp.  Additionally, Viad cross-appeals the superior court's ruling regarding pre-judgment interest.  For the following reasons, we affirm the superior court's grant of summary judgment in favor of Viad, but reverse the court's order regarding pre-judgment interest.

**FACTS AND PROCEDURAL BACKGROUND**

**¶2**        MoneyGram was a wholly owned subsidiary of Viad.  On June 30, 2004, Viad and MoneyGram agreed to spin off MoneyGram into an independent corporate entity.  The parties executed two contracts governing this transaction: a Separation and Distribution Agreement ("SDA"), and an Employee Benefits Agreement ("EBA").  The EBA provided that MoneyGram would assume the obligation of paying the benefits for a number of current and former Viad employees.

**¶3**        On June 1, 2004, shortly before the parties executed the EBA and completed the spin off, Viad executed an Amended Employment Agreement with its CEO, Robert Bohannon.  Under the Amended Employment Agreement, Viad and Bohannon agreed that his retirement benefits "shall in each case be calculated using 150% of [his] Annual Base Salary."  Bohannon continued to work for Viad after the spin off, retiring in

2

2008. In connection with the spin off, Bohannon served as a member on MoneyGram's board.

¶4 Following the spin off, MoneyGram performed its obligations under the EBA. However, in 2010, MoneyGram refused to pay retirement benefits to a number of prior employees of Motorcoach, a former Viad subsidiary. Viad filed a breach of contract claim based on the EBA. During the litigation, MoneyGram purportedly discovered that it was paying benefits in excess of its obligations under the EBA to Bohannon, Viad's retired CEO, as well as a large number of other retirees. As a result, MoneyGram informed Viad it intended to discontinue or reduce their benefit payments. In response, Viad amended its complaint to include Bohannon and the additional employees in its breach of contract claim.

¶5 Viad and MoneyGram filed cross-motions for summary judgment. Viad argued the EBA obligated MoneyGram to pay the disputed employee benefits. MoneyGram argued Viad's claims were preempted by ERISA and that it was not required to pay the disputed employee benefits. MoneyGram also objected to the inclusion of benefit claims for two additional former Viad employees, Bjornar Hermansen and Alice Smedstead.

¶6 The superior court granted Viad summary judgment on all its claims except its claims regarding the Motorcoach retirees, and denied MoneyGram's motion for summary judgment. The court rejected MoneyGram's preemption argument, finding that Viad's claims arose under the EBA, and not an ERISA plan. The court also rejected MoneyGram's arguments regarding Bohannon's claims, finding that the express terms of the EBA, as well as the relevant extrinsic evidence, showed that MoneyGram was obligated to pay Bohannon's benefits. The court also concluded the EBA required MoneyGram to pay the benefits for "105 retirees." The order, however, did not expressly include Hermansen and Smedstead in this group.

¶7 After the summary judgment ruling, the parties reached a settlement on all claims except those relating to Bohannon, Hermansen, and Smedstead. The court subsequently issued an order clarifying that Hermansen and Smedstead were included in the group of "105 retirees" covered by its summary judgment ruling. Thereafter, the court entered final judgment in favor of Viad on all remaining claims. MoneyGram filed a timely notice of appeal.

¶8      Shortly after filing its notice of appeal, MoneyGram filed a motion to correct the judgment pursuant to Arizona Rule of Civil Procedure 60(c). MoneyGram argued the judgment improperly calculated pre-judgment interest at the rate of 10%. Viad objected, arguing the superior court did not have jurisdiction to amend the judgment because of the pending appeal. Viad also argued MoneyGram had waived its right to object because it had never filed an objection to the 10% interest rate when the proposed form of judgment was lodged with the court. The trial court agreed with MoneyGram that the lower interest rate applied, and amended the judgment to reflect a pre-judgment interest rate of 4.25%. In its cross-appeal, Viad challenges the superior court's adjustment of the pre-judgment interest rate in the amended judgment.

## DISCUSSION

### I.    Standard of Review

¶9      "Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Russell Piccoli P.L.C. v. O'Donnell*, 237 Ariz. 43, 46, ¶ 10 (App. 2015). We determine whether the court properly granted summary judgment de novo. *Id.* at 46-47, ¶ 10. In reviewing a grant of summary judgment we consider the evidence and all reasonable inferences therefrom in the light most favorable to the non-moving party. *Id.* at 47, ¶ 10.

### II.    ERISA Preemption

¶10     MoneyGram asserts the superior court erred because it applied the wrong test for determining ERISA preemption. MoneyGram argues the court applied the complete preemption test[1] when it should have applied the conflict preemption test. MoneyGram concedes that Viad's claims are not preempted under complete preemption; however, it asserts Viad's claims are preempted under conflict preemption.

---

[1]    Complete preemption under ERISA is not a defense to a state law claim. Rather, complete preemption is based on 29 U.S.C. § 1132(a), and mandates 'exclusive federal jurisdiction' over claims between ERISA entities that could have been brought under ERISA. *Marin Gen. Hosp. v. Modesto & Empire Traction Co.*, 581 F.3d 941, 945 (9th Cir. 2009). Thus, "[n]ot only does complete preemption displace state substantive law, but it also recharacterizes state law claims as arising under federal law for purposes of determining federal question jurisdiction." *Satterly v. Life Care Centers of Am. Inc.*, 204 Ariz. 174, 177, ¶ 6 (App. 2003).

¶11         The conflict preemption provision of ERISA provides that ERISA "shall supersede any and all State laws insofar as they may now or hereafter *relate to* any employee benefit plan." 29 U.S.C. § 1144(a) (emphasis added); *see Satterly*, 204 Ariz. at 177, ¶ 7 (conflict preemption is a defense to state-law claims that "relate to any employee benefit plan."). In addressing conflict preemption under ERISA, the "starting presumption" is that "Congress does not intend to supplant state law," and "'that the historic police powers of the States were not to be superseded by [ERISA] unless that was the clear and manifest purpose of Congress.'" *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers*, 514 U.S. 645, 654-55 (1995) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

¶12         The phrase, "relate to," is broad; indeed, it is so broad the Supreme Court has recognized a pure textual application of the standard is not "workable." *Gobeille v. Liberty Mut. Ins. Co.*, 136 S.Ct. 936, 943 (2016); *see Travelers*, 514 U.S. at 655 (stating that if the phrase "relate to" under ERISA is "extend[ed] to the furthest stretch of its indeterminacy, then for all practical purposes pre-emption would never run its course."). As a result, "uncritical literalism" in analyzing the phrase "relate to" is disfavored. *Id.*, at 656. Instead, "pre-emption claims turn on Congress's intent," and courts must look "to the objectives of the ERISA statute as a guide" to determine the scope of ERISA preemption. *Travelers*, 514 U.S. at 655-56; *see Satterly*, 204 Ariz. at 177, ¶ 8 (stating that in determining whether a state law claim is preempted because it "relates to" an ERISA plan, the Supreme Court has "[m]ore recently . . . looked to ERISA's objectives when undertaking this analysis."); *Bui v. American Telephone & Telegraph Co. Inc.*, 310 F.3d 1143, 1147 (9th Cir. 2002) (given the difficulty in construing the expansive language of the ERISA conflict preemption clause, application of the clause has evolved "to a more pragmatic interpretation, in which courts seek to preserve the goals of Congress when it passed ERISA, while maintaining state control in traditional fields of state regulation.").

¶13         Congress' stated goals for ERISA are "to ensure uniform administrative enforcement" of employee benefit plans and to protect plan participants and beneficiaries. *Bui*, 310 F.3d at 1148; *see also Gobeille*, 136 S.Ct. at 946; *Satterly*, 204 Ariz. at 177, ¶ 8 (stating the objectives of ERISA include protecting participants in employee benefit plans and "the creation of a uniform body of benefits law to minimize administrative and financial burdens of complying with varied state laws and the advancement of ERISA's broad remedial purpose"). To achieve those goals, ERISA provides comprehensive regulation of employee welfare and pension benefit plans. 29 U.S.C. § 1001; *Travelers*, 514 U.S. at 650.

¶14   Viad's claims against MoneyGram do not implicate or interfere with Congress' objectives regarding ERISA. Here, there is no dispute that Bohannon and the subject employees are entitled to benefits under the Viad Plan. MoneyGram does not challenge the propriety of Bohannon receiving the full amount of his benefits, or calculating those benefits based on his amended employment contract with Viad. Rather, the dispute is whether the EBA obligates *MoneyGram* to pay for Bohannon's benefits that are based on his amended employment contract.

¶15   Viad's claims are further attenuated from the goals of ERISA because they do not affect the relationship between the traditional ERISA entities and plan participants/beneficiaries. *Bui*, 310 F.3d at 1148-49. Viad is not suing as an assignee of an ERISA plan participant or beneficiary; it is suing in its own right pursuant to an independent contract, the EBA. No ERISA participant or beneficiary is a party in this case. The only relationship affected is the contractual relationship, as defined by the EBA, between Viad and MoneyGram.

¶16   Accordingly, we conclude Viad's claims were not preempted under ERISA.

III.  The Bohannon Benefit Claim

¶17   Viad contends MoneyGram breached the EBA by refusing to pay the full amount of Bohannon's retirement benefits. MoneyGram counters the EBA does not obligate it to pay (1) Bohannon's benefits accrued based on his continued employment after the spin-off date or (2) Bohannon's benefits using the 150% calculator contained in his Amended Employment Agreement with Viad.

¶18   The parties agree this contract dispute is governed by Delaware law. "Delaware law adheres to the objective theory of contracts, *i.e.*, a contract's construction should be that which would be understood by an objective, reasonable third party." *Salamone v. Gorman*, 106 A.3d 354, 367-68 (Del. 2014) (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010)). The court's role in interpreting a contract is to "give priority to the parties' intentions as reflected in the four corners of the agreement." *Salamone*, 106 A.3d at 368 (quoting *GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del. 2012)). We must construe the agreement as a whole and give effect to all provisions in a way that harmonizes with the agreement's overall scheme or plan. *Riverbend Cmty., LLC v. Green Stone Eng'g, LLC*, 55 A.3d 330, 334-35 (Del. 2012) (quoting *GMG Capital*, 36 A.3d at 779).

¶19        The question of whether or not a contract is ambiguous is a question of law for the court to determine. *E.I. du Pont de Nemours & Co. v. Admiral Ins. Co.*, 711 A.2d 45, 56 (Del. 1995). A contract is not ambiguous merely because parties in a lawsuit disagree as to its meaning. *Id.* at 57. Unambiguous contract terms control "when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language." *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997).

¶20        However, "when there is uncertainty in the meaning and application of contract language, the reviewing court must consider the [extrinsic] evidence offered" to determine the parties' intent. *Id.*; *see also AT&T Corp. v. Lillis*, 953 A.2d 241, 252-53 (Del. 2008) (stating that "consideration of extrinsic evidence is required to determine the meanings" of ambiguous contract terms). A contract is ambiguous when "the provisions in controversy are fairly susceptible of different interpretations or may have two or more different meanings." *Eagle Indus.*, 702 A.2d at 1232. Additionally, a court may resolve an ambiguity in the terms of the contract by summary judgment where the extrinsic evidence offered by the moving party "is not *prima facie* rebutted so as to create issues of material fact." *Id.* at 1232-33.

¶21        Here, the issue is whether the language of Section 4.01 of the EBA, which addresses MoneyGram's obligation to pay for certain Viad pension plans, is ambiguous. The EBA provides that MoneyGram "shall assume and be solely responsible for . . . all obligations to pay benefits to Viad employees . . . under the Viad Corp Supplemental Pension Plan." Section 4.01 further states that MoneyGram's obligation shall be determined based on, or "using Final Average Earnings and Covered Compensation at termination of employment with Viad . . . and Credited Service through the Distribution Date." Section 4.01 also states the calculation should include "Final Average Earnings and Covered Compensation based on earnings on and after the Distribution Date to the extent applicable."

¶22        While both parties contend the EBA is unambiguous, neither party can agree about the meaning of Section 4.01. MoneyGram argues section 4.01 of the EBA limits its obligation to pay Bohannon's benefits to those for "Credited Service through the Distribution [spin-off] Date." MoneyGram also contends section 4.01 limits its obligation to pay benefits based on Bohannon's annual base salary at the time of his retirement, and not 150% of his annual base salary as provided for in the Amended Employment Agreement. Viad, on the other hand, interprets the EBA to

obligate MoneyGram to pay all of Bohannon's benefits as calculated by Viad.

¶23        We find Section 4.01 is ambiguous. The reference to "Credited Service through the Distribution Date" could be interpreted as placing a limit on MoneyGram's responsibility to pay for accruing benefits. On the other hand, the fact that section 4.01 mentions "Final Average Earnings and Covered Compensation based on earnings on and after the Distribution Date to the extent applicable" seems to indicate that in some cases, the Distribution Date would not cut off accrual of MoneyGram's obligation to pay a person's benefit. Furthermore, Section 4.01 is silent as to whether Bohannon's Amended Employment Agreement should be considered in calculating his Final Average Earnings. Thus, the parties' dispute has identified an ambiguity with regard to what is included in "*all* obligations to pay benefits to Viad Employees . . . under the Viad [Plan]."

¶24        "In construing an ambiguous contractual provision, a court may consider [extrinsic] evidence of prior agreements and communications of the parties as well as trade usage or course of dealing." *Eagle Indus.*, 702 A.2d at 1233; *see also ThoughtWorks, Inc. v. SV Investment Partners, LLC*, 902 A.2d 745, 752 (Del. Ch. 2006) (stating that where contract terms are ambiguous the court may consider extrinsic evidence to determine the parties' intent). As noted above, where there are no genuine factual disputes regarding the extrinsic evidence, a court may resolve an ambiguity in a contract on summary judgment. *Eagle Indus.*, at 1232-33.

¶25        There is no genuine factual dispute regarding the extrinsic evidence in this case; it clearly shows that MoneyGram is obligated to pay for Bohannon's benefits accruing after the spin-off date. The deposition of the CEO of MoneyGram explained that the post-spin-off SERP liability for Viad executives would be an obligation of Viad with the exception of Bohannon. Bohannon himself, who was the CEO of Viad and a Viad board member through the spin off, and a MoneyGram board member immediately after the spin off, understood that Viad employee benefit responsibilities accruing post-spin-off were the responsibility of Viad with the exception of his accruing benefits.

¶26        Bohannon's unique position is further reflected in his treatment under the Viad Plan. Of all Viad Plan participants, he is the only person listed in Schedule B' of the Viad Plan. Schedule B' contains two possible formulas for calculating Bohannon's benefit: one based on Bohannon's Credited Service, and one based on his retirement if he retired after reaching age 58. Deposition testimony supports Viad's contention that

because of the availability of an age 58 or later benefit, Credited Service, and thus a Credited Service cut-off, was not considered in calculating Bohannon's benefit.

**¶27**     The extrinsic evidence also supports Viad's position that MoneyGram is obligated to pay for Bohannon's benefit using his Amended Employment Agreement.  Testimony shows that Bohannon's employment agreement was amended because of the spin off; the purpose of the amendment was to ensure that his retirement was not adversely affected by his salary changes resulting from the spin off.

**¶28**     Bohannon occupied a unique role in the spin off.  He was the CEO of Viad and chairman of the Viad board prior to the spin off; for these roles he received a yearly salary of $900,000.  In connection with the spin off, he retained his positions with Viad, and also served as a board member for MoneyGram to assist the new MoneyGram CEO.  Thus, Bohannon's yearly salary from Viad was reduced to $600,000, and he was paid a yearly salary of $300,000 by MoneyGram.  This maintained Bohannon's total annual salary of $900,000; however, because Bohannon's pension benefits were connected to his employment at Viad, the result would have been a decrease in his benefits.  MoneyGram board members were aware of the amendment and the reasons behind it—namely, to ensure that Bohannon would not experience a reduced pension as a result of the spin off. MoneyGram's own CEO acknowledged that he knew Bohannon's employment agreement would be amended in connection with the spin off.

**¶29**     Here, Viad presented uncontroverted extrinsic evidence supporting its interpretation of MoneyGram's obligations under Section 4.01 of the EBA.  This evidence shows that MoneyGram was aware of its obligation, and in fact it contracted to pay the full amount of Bohannon's benefits.  MoneyGram's response and attachments did not create a material fact dispute or otherwise rebut the evidence presented by Viad. Accordingly, the superior court correctly granted summary judgment for Viad on Bohannon's benefit claims.  *See Eagle Indus.*, 702 A.2d at 1232-33; *see Federico v. Maric*, 224 Ariz. 34, 36, ¶ 7 (App. 2010) (stating that we will affirm a grant of summary judgment if it is correct for any reason).

IV.     The Hermansen and Smedstead Benefit Claims

**¶30**     MoneyGram argues the superior court erred in ordering it to pay benefits for former Viad employees Hermansen and Smedstead. Hermansen and Smedstead's claims came to light during discovery and after Viad filed its Amended Complaint.  MoneyGram argues that because

their claims could not have been alleged in Viad's Amended Complaint, they were not part of the court's summary judgment ruling. MoneyGram also argues the court violated Rule of Civil Procedure 15(b) by allowing Hermansen and Smedstead's claims to be tried by consent and amending the pleadings to conform to the evidence over its objection.

¶31 "Arizona is a notice pleading state, and therefore does not require extensive fact pleading." *Rosenberg v. Rosenberg*, 123 Ariz. 589, 592-93 (1979). A pleading need only contain a statement of grounds for jurisdiction, "[a] short and plain statement of the claim showing that the pleader is entitled to relief," and "[a] demand for judgment for the relief the pleader seeks." Ariz. R. Civ. P. 8(a). The purpose of the pleading is to "give the opponent fair notice of the nature and basis of the claim and indicate generally the type of litigation involved." *Cullen v. Auto-Owners Ins. Co.*, 218 Ariz. 417, 419, ¶ 6 (2008) (quoting *Mackey v. Spangler*, 81 Ariz. 113, 115 (1956)). "The test is whether enough is stated to entitle the pleader to relief on some theory of law susceptible of proof under the allegations made." *Verduzco v. Am. Valet*, 240 Ariz. 221, 223, ¶ 9 (App. 2016).

¶32 Viad's claims as pled encompassed the issue of payment for Hermansen's and Smedstead's benefits. The complaint alleged that MoneyGram had refused to pay for employee benefits it was obligated to pay under the EBA. The issue of whether MoneyGram was contractually bound to pay benefit plans for the more than 100 retirees involved the same facts and claims as the issue of Hermansen's and Smedstead's benefits. *Verduzco*, 240 Ariz. at 223, ¶ 11 (stating that where a party is put on notice of the plaintiff's claim, the allegations in the complaint are sufficient).

¶33 MoneyGram received fair notice of the nature and basis of Viad's claims for Hermansen and Smedstead. In its amended complaint, Viad alleged that pursuant to the EBA, MoneyGram agreed to "assume and be responsible for all payment obligations, responsibilities, and/or liabilities owed to certain former employees or other participants of Viad and/or Viad's former subsidiaries and affiliates under the Viad SERPs," which include the Viad Plan. Viad further alleged that MoneyGram informed Viad it would no longer make or would reduce supplemental pension payments under the Viad SERPS to "over 100" additional retirees. Additionally, Viad sought declaratory judgment "that MoneyGram is obligated, under the terms of the parties' agreements, to pay pension and medical benefits, in amounts determined by Viad, to those retirees or other participants who are determined by Viad to be eligible for such benefits."

¶34 MoneyGram reasons that the court's summary judgment ruling referring to "105 retirees" could not have included Hermansen and Smedstead because the court's rationale for granting judgment for this "group" of retirees could not factually support judgment for Hermansen and Smedstead. We agree that the court erred in grouping the benefit claims of Hermansen and Smedstead with the "individual pension arrangements reflected in ledger item 2650-515 on the Viad Corp General Ledger," a catchall list of individuals eligible for benefits. However, "[w]e will affirm a grant of summary judgment if the trial court was correct for any reason." *Federico*, 224 Ariz. at 36, ¶ 7.

¶35 Based on the record, Viad was entitled to summary judgment regarding Hermansen's and Smedstead's benefits. The record contains undisputed facts showing that MoneyGram was obligated to pay for both Hermansen's and Smedstead's benefits under the EBA. Under Section 4.01 of the EBA, MoneyGram assumed the obligation to pay benefits under the Viad SERPs and the Viad Plan. Smedstead is listed in Schedule C of the Viad Plan, a plan contained in the EBA's definition of Viad SERPs. MoneyGram's own internal document lists Smedstead as an individual covered by the Viad Corp SERP. Similarly, Hermansen is listed in the spreadsheet containing all SERP participants entitled to benefits. Hermansen is listed as a former employee of Premier Cruise Lines, and the record shows that MoneyGram is responsible to pay for Premier Cruise Lines SERPS. We find no error.

V. The Amended Judgment

¶36 In its cross-appeal, Viad argues the superior court erred in granting MoneyGram's untimely request to amend the pre-judgment interest rate listed in the original judgment. Viad claims the court had no jurisdiction to amend the judgment because a notice of appeal had been filed before MoneyGram made its motion. Alternatively, Viad contends MoneyGram waived its right to challenge the interest rate in the judgment. Specifically, Viad argues that MoneyGram failed to object to the interest rate when Viad lodged its proposed final judgment with the court. Finally, Viad argues the superior court incorrectly applied A.R.S. § 44-1201 to reduce the pre-judgment interest rate.

¶37 We review a trial court's grant of relief under Ariz. R. Civ. P. 60(c) for an abuse of discretion. *City of Phx. v. Geyler*, 144 Ariz. 323, 328 (App. 1985). In a case where the trial court's decision has been appealed, "[a] trial court may not render any decision that would defeat or usurp an appellate court's jurisdiction of a case on appeal." *State v. O'Connor*, 171

Ariz. 19, 21 (App. 1992). However, "a trial court retains jurisdiction to act so long as that act cannot negate the decision in a pending appeal or frustrate the appeal process." *Id.* at 22.

**¶38** We conclude the superior court properly retained jurisdiction to consider Viad's Rule 60(c) motion. MoneyGram initially appealed the substantive issues of whether it was obligated to pay the employee benefits for Bohannon, Hermansen, and Smedstead. As a result, the superior court's decision to adjust the rate of pre-judgment interest did not negate the substantive issues pending on appeal or frustrate the appeal process.

**¶39** The record also supports the court's determination that MoneyGram did not waive its right to challenge the interest rate in the judgment. "Waiver generally requires a finding of intentional relinquishment of a known right or of conduct that would warrant such an inference." *Minjares v. State*, 223 Ariz. 54, 58, ¶ 17 (App. 2009). Waiver is a question of fact; the trial court's finding on the issue is binding on this court "unless we conclude that the finding is clearly erroneous." *Id.*

**¶40** In its Rule 58(d) objection to Viad's proposed final judgment, MoneyGram centered its arguments on whether Hermansen and Smedstead should be included in the final judgment. The court entered judgment over MoneyGram's objections on December 5, 2014, and MoneyGram filed a timely notice of appeal. On January 16, 2015, MoneyGram filed its motion to correct the judgment seeking to change the interest rate to conform to its interpretation of A.R.S. § 44-1201. Based on these circumstances, the superior court found that MoneyGram did not waive its right to object to the interest rate in the judgment. We find no error.

**¶41** Viad's argument MoneyGram waived its objection mischaracterizes the different purposes of Rules 58(d) and 60(c). Ariz. R. Civ. P. 58(d) provides a party with the opportunity to object to the form of judgment. However, a party's failure to object under Rule 58(d) does not automatically bar the party from seeking relief from a judgment under Rule 60(c). In contrast, "[t]he purpose of [Rule 60] is to provide relief for those mistakes and errors which inevitably occur despite diligent efforts to comply with the rules." *See Maher v. Urman*, 211 Ariz. 543, 550, ¶ 21 (App. 2005) (quoting *City of Phx. v. Geyler*, 144 Ariz. 323, 332 (1985)).

**¶42** Nonetheless, we conclude the superior court misconstrued A.R.S. § 44-1201, and, as a result, erred in reducing the rate of pre-judgment interest. Whether the superior court applied the correct interest rate in

amending judgment is an issue of statutory interpretation we review de novo. *Metzler v. BCI Coca-Cola Bottling Co. of Los Angeles, Inc.*, 235 Ariz. 141, 144, ¶ 13 (2014). When interpreting a statute "our primary purpose . . . is to give effect to the legislature's intent." *Id.* We look to the plain meaning of the statute's language and "construe statutes so as to give effect to the whole." *Villa de Jardines Ass'n v. Flagstar Bank, FSB*, 227 Ariz. 91, 95, ¶ 7 (App. 2011).

¶43            It is well established that pre-judgment interest is awarded as a matter of right on a liquidated claim. *John C. Lincoln Hosp. & Health Corp. v. Maricopa Cty.*, 208 Ariz. 532, 542, ¶ 39 (App. 2004); *Alta Vista Plaza Ltd. v. Insulation Specialists Co., Inc.*, 186 Ariz. 81, 82 (App. 1995). Here, section 44-1201(A) provides a 10% interest rate "on any loan, indebtedness or other obligation . . . unless a different rate is contracted for in writing." A.R.S. § 44-1201(A). The plain meaning of subsection (A) is that a liquidated claim accrues interest at 10% interest rate unless the underlying agreement provides for a different interest rate.

¶44            On the other hand, section 44-1201(B) provides "interest on any judgment shall be at the lesser of ten per cent per annum or at a rate per annum that is equal to one per cent plus the prime rate," in this case 4.25%. A.R.S. § 44-1201(B). Pre-judgment interest awarded under subsection (B) is interest on an amount that "depends on a judgment for its existence." *Metzler*, 235 Ariz. at 146, ¶ 19. Thus, the plain meaning of subsection (B) refers to unliquidated claims. *See Id.* at 146, ¶ 20 ("[w]hat would otherwise be an unliquidated claim on which no pre-judgment interest is owed becomes liquidated, memorialized, and enforceable only when judgment is entered.").

¶45            Here, MoneyGram's contractual duty to pay employee benefit claims under the EBA is a liquidated claim. *See John C. Lincoln*, 208 Ariz. at 544, ¶ 39 ("A claim is liquidated if the plaintiff provides a basis for precisely calculating the amounts owed."). Accordingly, Viad was entitled to the 10% pre-judgment interest, and the court erred in amending the judgment.

## CONCLUSION

¶46            Viad was entitled to judgment on its claims for employee benefits due to Bohannon, Hermansen, and Smedstead. Although the court granted summary judgment based on an incorrect rationale as to Hermansen and Smedstead, these claims were encompassed in Viad's pleadings and the record establishes that MoneyGram is required to pay

these employees' benefits under the EBA.  Accordingly, we affirm the court's grant of summary judgment for Viad.

¶47        We reverse, however, the superior court's decision to lower the rate of pre-judgment interest in the amended judgment.  We conclude that Viad is entitled to pre-judgment interest at a rate of 10% pursuant to A.R.S. § 44-1201(A).  Thus, we reinstate the final judgment entered by the superior court on December 5, 2014.



AMY M. WOOD • Clerk of the Court
FILED:  AA