**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

MORGAN T. ZURN
VICE CHANCELLOR

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

March 19, 2021

Garrett B. Moritz, Esquire
Elizabeth M. Taylor, Esquire
Ross Aronstam & Moritz LLP
100 South West Street, Suite 400
Wilmington, Delaware 19801

Michael A. Barlow, Esquire
Adam K. Schulman, Esquire
Abrams & Bayliss LLP
20 Montchanin Road, Suite 200
Wilmington, Delaware 19807

RE: ***Tetragon Financial Group Limited v. Ripple Labs Inc.,***
C.A. No. 2021-0007-MTZ

Dear Counsel:

In this expedited contractual dispute, defendant Ripple Labs, Inc. ("Ripple")

has moved for summary judgment (the "Motion").[1] For the following reasons, I

grant Ripple's Motion.

## I.     BACKGROUND

Ripple is an enterprise blockchain company.[2] It uses a cryptocurrency called

XRP in its payment network, and hosts a platform, RippleNet, to facilitate

transactions.[3] Plaintiff Tetragon Financial Group Limited is an investment

---

[1] Docket Item ("D.I.") 120.

[2] D.I. 1 ¶¶ 14–15 [hereinafter "Compl."].

[3] *Id.* ¶¶ 14–15.

company.[4]  Plaintiff, through its affiliates (collectively, "Tetragon"), holds a majority of Ripple's Series C preferred stock.[5]  Ripple and Tetragon executed a stockholders' agreement dated December 20, 2019 (the "Stockholders' Agreement") memorializing Tetragon's investment and status as "Lead Purchaser."[6]  Pursuant to that agreement, Tetragon has a redemption right that is triggered upon a "Securities Default" as defined in Section 5.4:

> A "**Securities Default**" means if XRP is determined on an official basis (including without limitation by settlement) by the U.S. Securities and Exchange Commission (or (1) another governmental authority or (2) a governmental agency of similar stature and standing) to constitute a security on a current and going forward basis (and not, for the avoidance of doubt, a determination that XRP was a security in the past).[7]

If a Securities Default occurs, Tetragon may demand redemption of its shares via a "Redemption Request."[8]  Following receipt of a valid Redemption Request, the Stockholders' Agreement requires Ripple to redeem Tetragon's shares within sixty days and apply all of its legally available cash and other assets to the redemption.[9]

---

[4] *Id.* ¶ 13.

[5] *Id.* at 1 n.1, ¶ 13.

[6] *Id.* at 1 n.1.

[7] Compl. Ex. A § 5.4 [hereinafter "Stockholders' Agr."].

[8] *Id.* § 5.1.

[9] *Id.*

At issue in this case is whether certain actions by the Securities and Exchange Commission (the "SEC" or the "Commission")—in particular, a "Wells Notice" and the filing of an enforcement action—constitute a "Securities Default" under Section 5.4. Some brief background on these processes provides helpful context.

### A.     Wells Notices And Enforcement Actions Generally

SEC investigations are usually initiated when a potential violation of securities law is identified.[10] If the matter escalates, the SEC will issue a Formal Order of Investigation, which identifies the nature of the investigation, grants power to the SEC's staff (the "Staff") to investigate, and allows the SEC and its officers to issue subpoenas and compel sworn witness testimony.[11] If the Staff finds that further action is warranted, the Staff may recommend that the SEC file an enforcement action or institute other enforcement proceedings.[12]

Prior to doing so, the Staff may send potential defendants a Wells Notice, which allows potential defendants the chance "to provide a written submission" in defense of their actions.[13] At this stage, the Staff must obtain an Associate or

---

[10] D.I. 103, Ex. 24 ¶ 11 [hereinafter "Jackson Report"].

[11] *Id.* ¶¶ 11, 17.

[12] *Id.* ¶ 18; D.I. 103, Ex. 18 ¶ 52 [hereinafter "Pitt Report"].

[13] Jackson Report ¶ 18; *see* Pitt Report ¶¶ 53, 56–57.

Regional Director's approval.[14] Once a potential defendant submits a written response to a Wells Notice, that submission must be sent to the Commission with a staff memorandum.[15]

Following a Wells Notice, the Staff may recommend that the SEC settle or litigate the matter in a formal "Action Memorandum."[16] This recommendation takes into account the potential defendant's written submissions.[17] The Action Memorandum sets forth the recommendation's factual and legal bases, as well as its associated risks.[18] Based on the Action Memorandum and the potential defendant's written submissions, the Commission votes to approve or reject the recommendation.[19]

An enforcement action begins when the SEC files suit in federal court.[20] After the Commissioners vote to bring an enforcement action, they are minimally involved in the litigation.[21] Once the SEC decides to file in federal court, the SEC's role

---

[14] Jackson Report ¶ 19.

[15] *Id.*

[16] *Id.* ¶¶ 20–21.

[17] *Id.* ¶ 20.

[18] *Id.* ¶ 22.

[19] *Id.* ¶ 23; Pitt Report ¶¶ 57–59.

[20] Pitt Report ¶¶ 28, 30–32.

[21] D.I. 94, Ex. 34 at 24:10–24:16, 39:10–41:14.

pivots to that of advocate for its position;[22] barring settlement, the Court—not the Commission—decides whether the instrument in question is ultimately a security.[23]

### B. This Litigation

On January 4, 2021, Tetragon filed its complaint in this action,[24] seeking, among other things, a declaration that two actions by the SEC triggered Tetragon's redemption right: an October 2020 Wells Notice, and the SEC's December 2020 filing of a enforcement action in the U.S. District Court for the Southern District of New York (the "Enforcement Action").[25] Tetragon also sought specific performance of its redemption right.[26]

Tetragon also moved for expedition and a temporary restraining order enjoining Ripple from using its assets for any purpose other than redemption of Tetragon's shares.[27] I heard those motions on January 15,[28] and ordered expedition of the entire case, with a preliminary injunction hearing set for mid-February.[29] I

---

[22] *See id.* 67:5–9.

[23] *See* D.I. 105, Ex. 51 at 193:13–18.

[24] *See generally* Compl.

[25] *Id.* ¶ A.

[26] *Id.* ¶ B.

[27] *See generally* D.I. 1.

[28] *See* D.I. 21.

[29] D.I. 85 at 58:19–59:10 [hereinafter "TRO Ruling"]; D.I. 36 ¶ 1.

entered a less burdensome temporary restraining order than Tetragon requested, which enjoined Ripple from making extraordinary, or "net negative," purchases of XRP outside the ordinary course of business.[30]

The parties conducted fact and expert discovery, and briefed their positions on the preliminary injunction.[31] The parties focused on whether the Wells Notice and the subsequent filing of the Enforcement Action against Ripple constituted a Securities Default under the Shareholders' Agreement. I heard argument on the preliminary injunction on February 17.[32]

On March 5, I denied Tetragon's motion for a preliminary injunction.[33] I found that Tetragon was not reasonably likely to prevail on the merits because neither the Wells Notice nor the SEC's filing of the Enforcement Action constituted a Securities Default under the Shareholders' Agreement's plain language.[34] I also vacated the temporary restraining order.[35]

---

[30] TRO Ruling 58:1–11; D.I. 36 ¶¶ 2–3.

[31] *See* D.I. 94; D.I. 95; D.I. 103; D.I. 105.

[32] *See* D.I. 109; *see also* D.I. 114.

[33] *See* D.I. 119; *see also* D.I. 128.

[34] D.I. 128 at 9:17–21.

[35] *Id.* 27:1–3.

On March 8, Tetragon sought expedited certification of an interlocutory appeal on the meaning and application of the Securities Default provision.[36] I expedited my consideration,[37] but recommended against certification on the grounds that Tetragon did not raise a requisite substantial issue of material importance in this contract interpretation dispute.[38] Tetragon subsequently withdrew its application.[39]

On March 9, Ripple moved for summary judgment, which was expeditiously briefed.[40] For the following reasons, I maintain my earlier reading of the Stockholders' Agreement. Tetragon concedes that this conclusion disposes of its claims.[41] Ripple's Motion is granted and final judgment will be entered in its favor.

## II. ANALYSIS

A motion for summary judgment will be granted where the record before the Court shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[42] The movant bears the

---

[36] D.I. 120.

[37] D.I. 124.

[38] D.I. 129.

[39] D.I. 131.

[40] D.I. 127.

[41] D.I. 130 ¶ 8.

[42] Ct. Ch. R. 56(c).

burden, and the Court views all evidence in the light most favorable to the non-moving party.[43] While there is no absolute right to summary judgment, it is "encouraged when possible."[44] "[T]his Court has described pure matters of contractual interpretation as readily amenable to summary judgment"[45] because "proper interpretation of language in a contract . . . is treated as a question of law."[46] In such a case, "summary judgment is appropriate only if the contract in question is unambiguous."[47]

In line with "Delaware's well-understood principles of contract interpretation,"[48] I find that the Stockholders' Agreement's plain language is susceptible to only one meaning: a determination "on an official basis" that XRP "constitutes[s] a security on a current and going forward basis" answers the question of whether XRP is a security in the affirmative and with finality. Applying that

---

[43] *HIFN, Inc. v. Intel Corp.*, 2007 WL 1309376, at *9 (Del. Ch. May 2, 2007).

[44] *AeroGlobal Cap. Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 443 (Del. 2005).

[45] *Barton v. Club Ventures Invs. LLC*, 2013 WL 6072249, at *5 (Del. Ch. Nov. 7, 2013) (alteration and internal quotation marks omitted) (quoting *LaPoint v. AmerisourceBergen Corp.*, 2007 WL 1309398, at *3 (Del. Ch. May 1, 2007), *aff'd*, 956 A.2d 642 (Del. 2008) (TABLE)).

[46] *Pellaton v. Bank of N.Y.*, 592 A.2d 473, 478 (Del. 1991).

[47] *United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 830 (Del. Ch. 2007).

[48] *HIFN, Inc.*, 2007 WL 1309376, at *9.

meaning to the undisputed facts, I conclude that a Securities Default has not occurred.

### A.    The Plain Meaning Of Section 5.4 Controls.

The critical question is whether Section 5.4 is susceptible to any meaning that permits the conclusion that a Securities Default has occurred.    Under the plain meaning of that language, it is not.

"To determine what contractual parties intended, Delaware courts start with the text."[49]  In doing so, the Court aims to "give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions."[50]  "Delaware adheres to the objective theory of contracts, [meaning that] a contract's construction should be that which would be understood by an objective, reasonable third party."[51]  The Court will "give effect to the plain-meaning of the contract's terms and provisions," "will read a contract as a whole and . . . will give each provision and term effect, so as not to render any part

---

[49] *Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 846 (Del. 2019).

[50] *Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014) (internal quotation marks omitted) (quoting *GMG Cap. Inv., LLC. v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 779 (Del. 2012)).

[51] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (footnotes and internal quotation marks omitted) (quoting *NBC Universal v. Paxson Commc'ns*, 2005 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005)).

of the contract mere surplusage."[52] "Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language."[53]

"Unless there is ambiguity, Delaware courts interpret contract terms according to their plain, ordinary meaning," without resorting to extrinsic evidence.[54] Whether a contract is ambiguous is a question of law.[55] "Ambiguity exists when the provisions in controversy are reasonably or fairly susceptible of different interpretations."[56] Neither party here meaningfully contends that the definition of Securities Default is ambiguous, so I do not reach the parties' arguments about their negotiation history or other extrinsic evidence of their intent.[57]

---

[52] *Id.* at 1159–60; *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396–97 (Del. 2010).

[53] *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997).

[54] *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012).

[55] *HIFN, Inc.*, 2007 WL 1309376, at *9.

[56] *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 615 (Del. 2003) (internal quotation marks omitted) (quoting *Vanderbilt Income and Growth Assocs. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996)).

[57] Tetragon has invited the Court to conclude the provision is ambiguous and review its proffered negotiation history, but Tetragon has not meaningfully explained why it believes the provision is ambiguous. D.I. 120 ¶ 7. Moreover, as explained herein, I find that the definition in Section 5.4 is not ambiguous.

Instead, I turn directly to the language in question, and apply it to the Wells Notice and the SEC's filing of the Enforcement Action.

"Under well-settled case law, Delaware courts look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract," as "dictionaries are the customary reference source that a reasonable person in the position of a party to a contract would use to ascertain the ordinary meaning of words not defined in the contract."[58]  And so, I look to contemporary dictionaries to help understand Section 5.4's undefined terms.

By its plain meaning, a "determination" has finality.  According to *Merriam-Webster's Dictionary*, to "determine" something means to "to fix conclusively or authoritatively," as in to "determine national policy," or "to settle or decide by choice of alternatives or possibilities," as in to "determine the best time to go."[59]  The *Oxford Learner's Dictionary* similarly states that a "determination" is "the process of deciding something officially."[60]  The "official" nature of a determination is echoed in definitions in the legal arena.  In those definitions, a determination comes

---

[58] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006).

[59] *Determine*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/determine (last visited Mar. 19, 2021).

[60] *Determination*, Oxford Learner's Dictionary, https://www.oxfordlearnersdictionaries.com/us/definition/english/determination (last visited Mar. 19, 2021).

from an authoritative source, such as a court. *Black's Law Dictionary* tells us that a "determination" is "the act of deciding something officially; esp[ecially], a final decision by a court or administrative agency."[61] *Merriam-Webster's* definition suggests that a legal determination has finality, "a judicial decision settling and ending a controversy."[62]

As Tetragon points out, "determination," like many words, has several different definitions in several different dictionaries.[63] But the mere existence of multiple definitions does not itself create ambiguity.[64] Here, the surrounding words in Section 5.4 reinforce that the parties intended the definitions of "determination" I have adopted. "Determination" is modified by two phrases: it must be "on an official basis" and "on a current and going forward basis." Both modifiers point to

---

[61] *Determination*, *Black's Law Dictionary* (11th ed. 2019).

[62] *Determination*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/determination (last visited Mar. 19, 2021).

[63] *See* D.I. 130 ¶¶ 13–15; *see also E.I. du Pont de Nemours & Co. v. Admiral Ins. Co.*, 711 A.2d 45, 58 (Del. Super. Ct. 1995) ("Dictionaries define almost all words in several ways, and different dictionaries may often have different definitions.").

[64] *See Admiral Ins. Co.*, 711 A.2d at 59 ("If the mere existence of different dictionary definitions constitutes an ambiguity, drafting unambiguous contractual language would be impossible without defining almost every word. Standing alone, multiple dictionary definitions do not prove all differing definitions are reasonable." (citations omitted)).

definitions that construe a "determination" as a "final decision"[65] or one that "end[s] a controversy."[66]

First, the phrase "on an official basis" indicates the determination should be authoritative or authorized, as in an "official statement."[67]  This reinforces the use of the definitions cited above, particularly *Black's* definition, which involves "the act of deciding something officially."[68]

Second, the SEC's official determination must be made "on a current and going forward basis."[69]  This language suggests that the "determination" must have meaning both at the time it is made and into the future.  This, again, supports a construction of "determination" that involves finality or the end of a controversy, as in *Merriam-Webster's* definition.[70]

---

[65] *Determination*, *Black's*, *supra* note 61.

[66] *Determination*, Merriam-Webster, *supra* note 62.

[67] *Official*, *Black's Law Dictionary* (11th ed. 2019); *Official*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/official (last visited Mar. 19, 2021).

[68] *Determination*, *Black's*, *supra* note 61 ("the act of deciding something officially; esp[ecially], a final decision by a court or administrative agency.").

[69] Something "current" is "occurring in or existing at the present time" or "presently elapsing."  *See Current*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/current (last visited Mar. 18, 2021).  "[G]oing forward basis" references the future.

[70] As Tetragon points out, the phrase "on a current and going forward basis" is followed by a parenthetical clarification:  "(and not, for the avoidance of doubt, a determination that XRP was a security in the past[])."  This language does not confine the phrase "on a current

Section 5.4 also enumerates a single example of a Securities Default: a settlement. Canonically, Delaware courts interpret words "in the context of words surrounding them" and use specific examples to construe general language.[71] Settlements, by their very nature, end a controversy and constitute the final say on a subject. In this way, they exemplify the sort of final, binding decision described in the dictionary definitions of a "determination" cited above.

Based on the plain meaning of "determination," "on an official basis," and "current and going forward basis," as well as the attributes of a settlement, I conclude that a "Securities Default" involves a final, authoritative decision that XRP is currently a security and will be a security in the future. In other words, a "determination" in Section 5.4 answers the question of whether XRP is a security in the affirmative and with finality. That determination can be made by the SEC or by

---

and going forward basis" to only this narrow meaning, added "for the avoidance of doubt." While a determination that XRP was a security in the past is not a Securities Default, the "determination" in Section 5.4 still must construe XRP's "current and going forward" status. A "determination that XRP was a security in the past" would not end the controversy, as it would leave open the question of whether XRP is currently a security and whether XRP will be a security "on a . . . going forward basis."

[71] *See Agar v. Judy*, 151 A.3d 456, 473 (Del. Ch. 2017) (quoting *Zimmerman v. Crothall*, 2012 WL 707238, at *7 (Del. Ch. Mar. 27, 2012)).

"(1) another governmental authority," or "(2) a governmental agency of similar stature and standing."[72]

### B. Under That Plain Meaning, A "Securities Default" Has Not Occurred.

Applying this plain meaning to the SEC's decision to file the Enforcement Action and issue a Wells Notice, it is clear that neither constitutes a Securities Default.

### 1. An Enforcement Action Does Not Trigger A Securities Default.

I consider first whether filing the Enforcement Action triggered a Securities Default. It does not. Filing a complaint in an enforcement action lacks the essential and characteristic finality of a determination described in Section 5.4. The SEC's decision to file the Enforcement Action against Ripple initiated a process by which the District Court, not the SEC, will ultimately determine whether XRP is a security on a current and going forward basis. While the SEC has taken the litigation position that XRP is a security, it left the final resolution of whether it is, in fact, a security to the District Court. The act of filing the Enforcement Action is not itself "the act of deciding something officially; esp[ecially], a final decision by a court or

---

[72] Stockholders' Agr. § 5.4.

administrative agency," as contemplated by *Black's*; nor is it akin to "a judicial decision settling and ending a controversy," as described in *Merriam-Webster's*.[73] By filing the Enforcement Action, the SEC started down an enforcement avenue, but has not yet arrived at its end, which is the "determination." And Section 5.4 contemplates authorities other than the SEC may make the triggering determination, as a "determination" may be made by "another governmental authority."[74]

Tetragon takes the position that by filing the Enforcement Action, the SEC has, within its own theater, made a triggering determination that XRP is a security. This argument seems appealing at first blush, as there can be no question that the SEC has taken a position that XRP is a security. But a determination within the SEC's theater, which does not adjudicate whether XRP is a security beyond the SEC, is not a Securities Default under the Agreement's plain language. A determination on an official basis is final and authoritative. It ends the controversy. Under the plain terms of Section 5.4, such a decision must reach beyond the SEC's walls, and determine that XRP is a security "on a current and going forward basis." This conclusion is further supported by contrasting settlements, which Section 5.4 specifically identifies as a determination that would constitute a Securities Default,

---

[73] *Official*, *Black's*, *supra* note 67; *Official*, Merriam-Webster, *supra* note 67.

[74] *Official*, *Black's*, *supra* note 67; *Official*, Merriam-Webster, *supra* note 67.

with preliminary allegations in complaints.  Settlements resolve disputes; allegations do not.

To be sure, the SEC's decision to sue Ripple has consequences.  As Tetragon points out, after receiving the Wells Notice, Ripple pleaded with the SEC not to determine, within its own theater, that XRP is a security.[75]  But XRP is no more a security after the SEC filed the Enforcement Action than it was before it.  A "determination" under Section 5.4 resolves the question of whether XRP is a security.  The Enforcement Action, by contrast, asks that question.  The question is not yet resolved, so a "determination" has not yet been made; and when it is made, it will be made by the District Court.

The plain language of Section 5.4 precludes treating the SEC's filing of the Enforcement Action as a Securities Default.

### 2.    The Wells Notice Does Not Trigger A Securities Default.

Tetragon's arguments regarding the Wells Notice present an even weaker case for a Securities Default.[76]  A Wells Notice precedes an enforcement action, giving

---

[75] D.I. 94, Ex. 20 at 2–3, 46–50.

[76] Tetragon's own expert, Professor Jackson, was unwilling to state that Wells Notices are determinations by the SEC.  *See generally* Jackson Report.  He repeatedly concluded that his opinion on the matter was unnecessary. D.I. 103, Ex. 2 at 40:21–22, 41:19–22. Professor Jackson stated that he would want to see Ripple's particular Wells Notice to

potential defendants notice of the SEC investigation and providing them the opportunity to explain to the SEC why an enforcement action is unnecessary.[77] As the parties' experts explained, a Wells Notice indicates that the Staff might recommend an enforcement action to the SEC Commissioners, but the Commission itself is free to reject this recommendation.[78] SEC Commissioners, who lead the SEC, are simply not involved in the Wells process.[79] Further, a Wells Notice invites the potential defendant to convince the Staff that such a recommendation would be improper.[80] Wells Notices often do not result in any further action by the SEC.[81] A Wells Notice from Staff is a far cry from the type of official, final decision contemplated by Section 5.4.

---

opine upon whether it is an official determination, but Tetragon did not provide it to him to review. *Id.* 85:1–17. And so, "in its zeal to reach a desired litigation outcome, [Tetragon] finds itself in the awkward position of advancing a position at odds with its own expert." *Manichaean Cap., LLC v. SourceHOV Hldgs., Inc.*, 2020 WL 496606, at \*20 (Del. Ch. Jan. 30, 2020), *aff'd*, 2021 WL 225817 (Del. Jan. 22, 2021) (TABLE).

[77] Pitt Report ¶¶ 56–57; D.I. 31, Decl. of Robert J. Jackson, Jr. ¶ 10 [hereinafter "Jackson Decl."].

[78] Pitt Report ¶¶ 51–53; Jackson Decl. ¶ 12.

[79] D.I. 103, Ex. 19 ¶¶ 8, 18.

[80] Pitt Report ¶ 56.

[81] *Id.*; *see* Jackson Decl. ¶ 12.

### 3. Other SEC Processes Satisfy The Definition Of "Securities Default."

My conclusion that the SEC actions at issue fall short of "determinations" does not gut Section 5.4 of its meaning. It is undisputed that the SEC can make "determinations on an official basis" in three other ways: (1) an administrative proceeding, (2) a report pursuant to the Securities Exchange Act of 1934 (the "'34 Act"), and (3) rulemaking.[82]

First, in an administrative proceeding, the SEC initiates an enforcement action before an administrative law judge. After the administrative law judge makes her decision, the SEC Commission makes its own final determination through a review of that decision.[83]

Second, the '34 Act authorizes the Commission to undertake investigations "necessary to determine whether any person has violated, is violating or is about to violate any provision of this chapter," or other SEC regulation.[84] The Commission may thereafter publish a report, called a 21(a) report, describing the investigation.[85]

---

[82] D.I. 103 at 21–23; *see generally* D.I. 94; D.I. 105; D.I. 114 at 8:16–9:9; 55:9–16.

[83] Pitt Report ¶¶ 24–29; D.I. 105, Ex. 51 at 101:7–20.

[84] 15 U.S.C. § 78u(a)(1). Despite its official citation, this section is referred to as "Section 21."

[85] *See id.*

That determination is final and comes from the SEC Commission itself.[86]  In one recent example, the Commission released a 21(a) report in the cryptocurrency space, in which the SEC determined that certain tokens were securities, consistent with the SEC's statutory authority.[87]

Third, under its rulemaking authority, the SEC votes to issue rules and regulations pursuant to the Administrative Procedure Act.[88]  Through this mechanism, the SEC may give its views the full force of the law.[89]

The parties agree that all three of these actions would constitute a "determination" for the purposes of Section 5.4.  Indeed, these "determinations" all have the hallmarks of the official, final, and controversy-ending decisions described in *Black's* and *Merriam-Webster's*.  They also have the force of the SEC Commission behind them.  Each ends at an SEC determination that is final and has present effect, even though there are mechanisms for additional review, like appeal or judicial review.[90]  These alternative paths for a determination show that the SEC

---

[86] D.I. 94, Ex. 34 at 87:7–21; *see* D.I. 94, Ex. 35 at 179:10–180:16; D.I. 94 at 27–28.

[87] D.I. 94, Ex. 3. ("Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934:  The DAO, Exchange Act Release No. 34,81207, 117 SEC Docket 745 (July 25, 2017)").

[88] 5 U.S.C. § 551.

[89] D.I. 94, Ex. 34 at 32:9–33:5; *see* Jackson Report ¶¶ 46–47.

[90] Jackson Report ¶¶ 23, 56; D.I. 94, Ex. 35 at 161:1–21; D.I. 94, Ex. 34 at 156:4–12.

has ample power to resolve the question of whether XRP is a security with finality, and give meaning to Section 5.4's provision for a determination on an official basis by the SEC.

These other routes to final SEC determinations further undermine Tetragon's position. Tetragon argues a Securities Default can be an SEC determination within its own theater. But an internal SEC decision to initiate an enforcement action is fundamentally different from the final "determinations" resultant from the SEC's other enforcement avenues. Section 21(a) reports, formal rulemaking, administrative proceedings, and even settlements all end in a final determination vis-à-vis the world, not only within the SEC's theater. An enforcement action before a District Court is distinguishable from the other avenues available to the SEC, which would result in an SEC determination. These avenues all end at the same point: a final conclusion that the instrument at issue is a security now and is a security going forward. The Enforcement Action against Ripple may ultimately end in a similar place. But it will arrive there because of the District Court's decision, not the SEC's.

### III.    CONCLUSION

For the foregoing reasons, Ripple's motion for summary judgment is

**GRANTED**.  An implementing order accompanies this letter.

Sincerely,

*/s/ Morgan T. Zurn*

Vice Chancellor

MTZ/ms

cc:  All Counsel of Record, via *File and ServeXpress*